**UNITED STATES of America**

**v.**

**Robert SOBLEN a/k/a Robert Soble.**

United States District Court
S. D. New York
Nov. 3, 1961.

Robert M. Morgenthau, U. S. Atty., David R. Hyde, Asst. U. S. Atty., of counsel, for the Government.

Ephraim London. New York City, for defendant.

HERLANDS, District Judge.

The defendant moves under Federal Rules of Criminal Procedure, Rule 33, 18 U.S.C., for a new trial in a proceeding in which the defendant was convicted and sentenced to life imprisonment for violations of Title 18 U.S.C. § 793(a) (c) (g) and § 794 (a) (c).

On August 7, 1961, the day of sentence, the defendant requested the Court to defer sentence pending the making of a motion for a new trial (Trial 1671–1688).* The Court declined to adjourn sentence, stating that the defendant's attorneys should make the motion for a new trial, if so advised, in regular course (Trial 1686–1688). The motion papers herein were filed on October 5th, 1961, and made returnable on October 9th, 1961.

This Court has proceeded to determine the merits of the motion on all of the grounds permitted by Rule 33: "newly discovered evidence" and "the interest of justice." In so doing, the Court has disregarded the five-day time bar prescribed by Rule 33 with respect to grounds for the motion other than newly discovered evidence. In so disregarding said time bar, this Court has not adjudicated the question whether the defendant's motion is subject to said bar, believing that the particular circumstances and the nature of this case make it advisable to determine the validity of the motion on any and all possibly applicable grounds.

The Court has proceeded to conduct full hearings on the motion for a new trial. The record of those hearings runs to 550 pages and includes numerous exhibits.

Upon the trial, two of the prosecution's key witnesses were Jack Soble, a brother of the defendant, and Mrs. Johanna Koenen Beker.

With respect to Jack Soble, the defendant now urges as a ground for a new trial that, at the time of the trial, Jack Soble was incompetent as a witness by reason of his mental condition; that the Government failed to disclose to the defense and to the Court medical reports and data that allegedly would have demonstrated that Jack Soble was psychotic (Motion 247, 248, 275–276, 280–281, 329); and that, regardless of the diligence or lack of diligence of defense attorneys in discovering such evidence, the prosecution was required to make a full disclosure of Jack Soble's mental condition. (Motion 251–252, 270, 275–276, 280–281, 329.)

With respect to Mrs. Beker, the defendant now urges as a ground for a new trial that her trial testimony centered critically around one Hans Emil Hirschfeld; that, according to her trial testimony, Hirschfeld, a wartime employee in the New York office of OSS during 1943 to 1945, had furnished her with national defense information which was in turn delivered to the defendant; that she met Hirschfeld a number of times, having originally been placed in contact with him by the defendant; and that the defendant gave her money with which to pay Hirschfeld for his services.

The defendant's present contention is that he has newly discovered evidence which, he claims, had been suppressed at

---

* Page references to the official transcript of the main trial record will be indicated as "Trial." Page references to the official transcript of the record of proceedings on the motion for a new trial will be indicated as "Motion."

the trial by the Government; that the essence of said newly discovered evidence is that Hirschfeld, in 1957 and 1960, had been confronted by Mrs. Beker and that he flatly denied ever having seen, met, spoken to or worked with Mrs. Beker; that Hirschfeld, in a number of interviews with Government representatives, insisted on his complete innocence of the inculpatory acts attributed to him by Mrs. Beker; and that Hirschfeld testified in February, 1960 before the Grand Jury for the Southern District of New York, repeating before said body the denials already referred to.

The defendant also urges as a ground for a new trial that he has discovered that various former OSS employees are prepared to testify that Hirschfeld had no access to secret information, particularly secret information about national defense weapons; and that, as a German Social Democrat, he expressed and adhered to anti-Communist political tenets.

The defendant has also applied for leave to take Hirschfeld's testimony by deposition under Rule 15, F.R.Crim.Proc., which proposed testimony would be a comprehensive denial of Mrs. Beker's testimony.

The hearings upon this motion and the entire record made in connection therewith amplify the grounds of the defendant's motion, summarized above.

The Court's numbered and unnumbered findings of fact and conclusions of law are set forth in this decision and opinion.

### HANS EMIL HIRSCHFELD

Assistant United States Attorneys Hyde and Casey, who tried this case, accurately described (1) the procedure followed in preparing and furnishing the defense with the exhibits consisting of Mrs. Beker's F.B.I. statements; (2) the Government's compliance with the Court's rulings as to the contents of those exhibits; (3) the significance of the Government's red crayon markings on the exhibits and the condition of the exhibits when turned over to the defense; (4) the return of the exhibits by the de-

fense and the condition of the exhibits when so returned; (5) the continuity of condition and possession of the returned exhibits from the moment of return to the time when they were produced upon the hearing of the present motion.

With respect to the Hirschfeld phase of the motion, the Court finds the following facts to have been established by the overwhelming weight of the credible evidence:

1. The complete F.B.I. reports of Mrs. Beker's interviews and statements were furnished to and read by the Court.

2. At that time each report that contained material which the Government conceded fell within the operation of § 3500 (Title 18 U.S.C.) was marked with red crayon by the Government so as to indicate the portions admittedly required to be turned over to the defense. (Trial 498, 500, 505, 516, 517, 520, 521, 524, 529; Motion 131–132, 197–199, 375). This is illustrated by Exhibits 169 and 188 (for id.).

3. Where the report in its entirety was conceded by the Government to fall within the operation of § 3500, the entire report was turned over without red crayon markings. This is illustrated by Exhibit 177 (for id.).

4. There were no ink-markings around any sentences or paragraphs or in the margins of any of the exhibits for identification when such exhibits were read by the Court and when such exhibits were furnished by the prosecution to the defendant. However, when Exhibits 149, 151, 157, 159, 177 and 191 were returned by the defense to the attorneys for the prosecution, there was such ink-markings, sometimes in blue ink, sometimes in green ink, and sometimes in ink of both colors. (Motion, 378.)

A comparison of the portions of the exhibits so ink-marked with the use of such ink-marked portions by defendant's trial attorney on his cross-examination of Mrs. Beker, discloses that, in each instance where Mr. Brill cross-examined Mrs. Beker about a particular page of a particular exhibit, the portion of the ex-

hibit used for such cross-examination was ink-marked as indicated above. (Motion, 378.) This is demonstrated by the following tabular comparison:

| Trial Record (page) | Exhibit (id) (number) | Specific Portion of Exhibit (id) Used in Cross-Examining Mrs. Beker |
|---|---|---|
| 1318–1322 | 149 | page 10, 2nd and 3rd paragraphs |
| 1332–1335 | 149 | page 11, last paragraph |
| 1317–1318 | 151 | first page, 2nd paragraph |
| 1279–1280 | 157 | page 14, last paragraph |
| 1308–1313 | 159 | page 17 and page 5 |
| 1294 | 177 | page 9 (same facts as in first two sentences of 2nd paragraph, page 11) |
| 1326–1332 | 191 | page 1, 2nd paragraph |

The characteristics of the ink-markings on page 11 of Exhibit 177—a small hook at the top of the vertical line—appear on the marking on page 5 of Exhibit 159.

The Court finds that the ink-markings on page 11 of Exhibit 177 were placed thereon by the defense, evidencing the fact that page 11—which the defense now claims was not furnished to it—was not only in possession of the defense but was scrutinized by the defense.

The Court finds that the ink-markings on the exhibits tabulated above were placed on said exhibits by the defense.

5. The original exhibits, not photostats, were turned over to the defense, in the case of Mrs. Beker's F.B.I. statements or portions thereof. (Motion, 377.)

6. The Court made longhand notes of each ruling, recording the lines and paragraphs of each page of each exhibit to be turned over to the defense. (Motion 194–196.) [1] Mr. Friedman made detailed

1. The care to be taken, and, in fact taken, with respect to the procedure in the marking and preparing of exhibits supplied to the defense under Title 18 U.S.C. § 3500 is illustrated by the Court's explicit instructions to the attorneys, as follows:

"THE COURT: * * * But I do not want an argument raised later on, as in a recent case, that certain documents were discovered after the trial, or that the defense were not told about it. I am referring to the recent Consolidated Laundries antitrust case" (Trial 494–495).

"THE COURT: * * * Let us mark the papers, whatever they are, so that there won't be any question later on about papers not being produced, and I will read them all, every word" (Trial 496).

"THE COURT: * * * I want it specifically checked so that the record will show what the situation is.

"You see, all these things may be clerical at the moment, and then about three months from now what appears to be clerical may become a cause celebre, so we may as well find out right now what the situation is." (Trial 538.)

Similar instructions by the Court and the close attention paid by defense counsel to the exhibit-turnover procedure are illustrated by the following colloquy (Trial 1074–1075):

"MR. FRIEDMAN: A photostat of a copy of a statement, is that correct?

"MR. CASEY: It is a photostat.

"THE COURT: Suppose you give Mr. Brill the original of Exhibit 128 for identification.

"MR. BRILL: I have read it already, Judge.

"THE COURT: I want you to compare it now so there won't be any question later. If you want to, you can indicate the pagination, Mr. Brill.

"MR. FRIEDMAN: Except the original statement appears to have three lines handwritten between the typing and the signature which does not appear—

"THE COURT: You can copy it off now. * * * You can copy it.

shorthand notes of each of the Court's rulings.

The same precautions were taken with respect to the return of the exhibits.[2]

7. Mr. Friedman, who took shorthand notes of the Court's detailed rulings as to what was to be turned over to the defense (Motion 192, 193), checked each exhibit that was supplied to him in order to assure himself that the turned-over exhibit complied with the Court's ruling. (Motion 190, 193; 206; Trial, 888–889, 890, 891, 1002.) Mr. Friedman followed the exhibit-marking proceedings closely. (See, e. g., Trial 1238.) Everything was placed on the record in the presence of the defendant and his attorney (Motion 130, 196).

8. Exhibits 169, 177 and 188 (for id.) are now in the same condition as they were when they were turned over to the defense during the trial and when they were returned by the defense to the prosecution during the trial, the sole exception being the pen markings on Exhibit 177 (id.) which the Court finds (See Finding "4" above) were placed thereon while that exhibit was in the possession of the defense.

9. Exhibits 169, 177 and 188 (for id.) in particular (as well as the other exhibits in general) were turned over to the defense in complete conformity with the Court's rulings. They were delivered by the Government to defense counsel following Mrs. Beker's direct testimony

(Trial, 1230, 1232, 1235; Motion 373–381).

a). As to each of the aforesaid exhibits, defense counsel received the actual exhibit bearing the clerk's stamp for use in their cross-examination of Mrs. Beker.

b) During the trial, the defense received Government exhibits 169 id., 177 id., and 188 id. in the exact form in which they were produced at the hearing of this motion. As produced at the trial by the Government and given to the defense, those exhibits included the portions thereof separately marked at the hearing of this motion as Def. Exs. A, B, and C.

c) At the conclusion of Mrs. Beker's cross examination, the aforesaid exhibits were returned to the Government (Trial 1338, Motion 378–379), and were kept under security lock in the United States Attorney's offices until they were produced for use at the hearing of this motion. (Motion 379, 429.)

The defense claim—that Exhibits 169, 177 and 188 (for id.), when turned over to the defense, did not contain the portions referring to Mrs. Beker's 1957 and 1960 confrontations of Hirschfeld and Hirschfeld's denials of Mrs. Beker's story (Motion 74, 125–126, 137, 138, 139, 177, 178, 179, 180–181, 185, 201)—is unfounded and completely devoid of merit.

Mr. Friedman and Mr. Brill and the defendant himself had possession of the exhibits turned over to the defense. The defense itself admits that Mr. Brill and

"MR. BRILL: It is the same, your Honor. Those photostats are the same as the contents of Government's Exhibit 128 for identification.

"THE COURT: That is why I wanted the comparison made, because while it is perfectly clear to everybody now that they are the same, there may be a question raised sometime in the future by some other lawyer. That happens.

"MR. BRILL: It does, it does. I have seen it happen."

2. For example, at the conclusion of Mrs. Beker's examination, the prosecutor requested defense counsel to return all of the Section 3500 material previously delivered to defense counsel. Mr. Friedman

said that he would "have to go around and bring them" (Trial 1338–1339). Mr. Brill said: "I will return all I have," at which point the Court said: "Well, I think what should be done is that at the conclusion of the session this afternoon all of the material that is returned should be inventoried by the Government so that they may keep track and counsel may keep track of what is being returned so that neither side will be involved in any embarrassments," to which Mr. Brill replied: "Oh, no. That's one thing we want to avoid, your Honor." The Court then stated: "That's right. That can be taken up between counsel at the conclusion of the session," to which Mr. Brill replied: "All right." (Trial 1339.)

the defendant read some of the exhibits. Mr. Brill eliminates himself from the picture by testifying that he relied on Mr. Friedman to call his attention to anything in the exhibits that he could use on cross-examination (Motion 220, 223, 224, 246). Mr. Brill's "best recollection" is that, during the trial, he had no information from any source of Hirschfeld's denials of Mrs. Beker's story and of Hirschfeld's denials of having met her before the 1957 and 1960 confrontations (Motion 221-222).

■ In the exercise of his constitutional prerogative, the defendant did not take the stand at the hearing on this motion. No adverse inference may be drawn against him for having duly exercised his constitutional privilege.

With Mr. Brill rendered innocuous on this exhibit issue, Mr. Friedman becomes the sole protagonist.

Mr. Friedman did not produce his trial notes relating to the exhibits in question; nor did he produce any contemporaneous memoranda indicating just what exhibits or portions thereof he read. His ipse dixit is all that is offered.

The critical query—what was contained in the exhibits that Mr. Friedman admits were turned over to him—is sought to be answered by the defense solely on the basis of Mr. Friedman's playback of his uncorroborated memory.

In these circumstances, it is pertinent to ascertain whether Mr. Friedman's memory as displayed on the stand is such as to merit confidence in its precision, accuracy and completeness.

Hearing and reading Mr. Friedman's testimony lead the Court to find unqualifiedly that Mr. Friedman's testimony cannot be accepted as reliable and trustworthy on any of the critical controverted issues herein.

His memory, as demonstrated on the stand, was not good as to many details of the trial proceedings.[3]

To the foregoing must be added his demeanor and manner of testifying; his interest as the past and present lawyer for the defendant (Motion 211-212); his possible motive for exonerating himself from criticism for the manner in which he handled the trial that resulted in a conviction; and his unfounded excuse for not having interviewed Mrs. Beker before trial. These circumstances constitute in the aggregate the basis for this Court's disbelief of Mr. Friedman's testimony.

On the other hand, this Court is firmly convinced that Assistant United States Attorneys Hyde and Casey have testified truthfully and accurately.

11. Exhibits 169 (id.) disclosed to the defense during the trial the following facts:

(a) Mrs. Beker was interviewed by the F.B.I. on October 9, 1957.

(b) The prosecution had no objection to turning over to the defense the excerpts contained in this exhibit that were marked with red crayon.

(c) Facts appearing in the following paragraph in the exhibit:

"Regarding subject's confrontation of HANS E. HIRSCHFELD, she advised that this took place in ' Berlin, Germany, on September 27, 1957. She immediately recognized HIRSCHFELD, however, he denied knowing her. The subject said that as far as she could determine, HIRSCHFELD displayed no sign to

---

3. See, for example, his testimony at pages 125 (3rd answer); 129 (4th answer); 138 (1st answer); 139 (2nd answer); 148 (2nd, 3rd and 6th answers); 151 (first answer); page 154 (last answer); 155 (1st, 2nd and 3rd answers); 159 (3rd answer); 160 (3rd, 4th, 5th and 6th answers); 161 (last answer); 174 (2nd and 3rd answers); 175 (4th answer); 176 (3rd, 4th, 6th answers); 177 (1st, 4th answers); 180 (6th and 7th answers); 181 (entire page); 185 (6th and 7th answers); 186 (4th answer); 188 (1st answer); 189 (2nd answer); 190 (1st answer); 193 (2nd answer); 205 (5th and 6th answers); 207 (6th answer); 208 (1st answer); and 209 (4th answer).

her that indicated he actually recognized her."

12. Exhibit 177 (id.) disclosed to the defense during the trial the following facts, among others:

(a) The exhibit consists of the complete signed statement (dated February 25, 1958) of Mrs. Beker to the F.B.I.

(b) Facts appearing in the following paragraph on page 11 of the exhibit:

"While I was in Germany recently I personally confronted Hans E. Hirschfeld in West Berlin, where he is presently an official of the West Berlin Government. This confrontation took place on September 27, 1957. I instantly recognized Hirschfeld and I am absolutely certain he is the same person whom I contacted in New York City at the direction of Dr. Robert Soble."

13. Exhibit 188 (id.) disclosed to the defense during the trial the following facts:

(a) Mrs. Beker was interviewed on January 29, 1960 by the F.B.I. under the circumstances set forth in the report.

(b) The prosecution had no objection to turning over to the defense the material in this exhibit that was marked with red crayon.

(c) Facts appearing in the following paragraphs of the exhibit:

"JOHANNA BEKER was escorted into the interview room for a confrontation with HIRSCHFELD. HIRSCHFELD immediately said that he recalled having met BEKER at the time that she confronted him in his Berlin office in 1957. He said that at that time BEKER had stated that she had called him at his Bronx, New York, apartment and had talked to his wife. HIRSCHFELD said that he had talked to his wife and that she had denied this. He said that BEKER was a 'liar'.

"HIRSCHFELD said that prior to the 1957 confrontation, he had never met BEKER at any time. He said he was positive that he had never encountered her during his work with OSS. He denied that he had ever given BEKER information of any kind. He said he was unable to understand why BEKER had made these accusations against him. He stated that the only reason that he could find for this was the fact that his name, along with the names of certain other German emigres, had appeared in an article in the 'Network,' a publication edited by RUTH FISCHER in New York City during World War II. This article had described HIRSCHFELD as a 'STALIN agent.'

"BEKER told HIRSCHFELD that sometimes there were things that people did not like to remember, especially after 20 years, but sometimes it was best to remember them and to 'get rid of them.'

"HIRSCHFELD recalled that he had been acquainted with BEKER's father, WILHELM KOENEN, who had been a Communist leader in the German Parliament for many years. Because of this familiarity with the KOENEN name, he said he was certain that had he ever actually met BEKER, he would have remembered her.

"BEKER said that she was certain that she had met HIRSCHFELD in New York City as previously described, unless he had a twin brother. She told HIRSCHFELD that the person she met at the corner of West 23rd Street and 7th Avenue had the same face and the same name as HIRSCHFELD.

"HIRSCHFELD, at this point, stated he had a brother who lived in the Bronx.

"BEKER said she had a definite recollection of having called HIRSCHFELD's apartment in New York on at least one or two occasions. She continued that it had been necessary for her to 'resurrect' her memory and stated that she thought that HIRSCHFELD should do likewise.

She told him that she knew that he believed in 'our Berlin,' and said that if HIRSCHFELD wanted to help the cause of free Berlin, this was the time to do it.

"HIRSCHFELD replied that his loyalty and devotion to the city of Berlin was a matter of public record.

"BEKER told HIRSCHFELD that he must recall the meetings which he had had with her in New York City. She said he was certain that he could remember them if given 'little helps and reminders' as she had been.

"HIRSCHFELD then said that he did not feel that he had to 'listen to this.' He pointed out that he would be glad to listen to Mrs. BEKER if she had something new to add, otherwise he did not want to hear any more. He claimed that he had a good memory and that he would certainly be able to recall if he had given away any OSS 'secrets'. He said he thought he had clarified this matter before, pointing out that the same allegations had been made against him during the 1957 confrontation.

"BEKER told HIRSCHFELD that when he looked at her now and when he looked at her at the Berlin meeting, she had a feeling that he recognized her. She remarked that he had very expressive eyes. She declared that what they had done in New York City was almost understandable in view of the wartime situation in which they found themselves as German refugees in New York City.

"HIRSCHFELD denied that there were any facts or other matters which would help him remember any meetings with BEKER, and he reiterated that he had never met her under any circumstances prior to 1957. He said he was not a child and he was positive that if these meetings had occurred, he would never have forgotten them.

"BEKER stated that she could only appeal to HIRSCHFELD to reveal his activities, pointing out to him that while in New York City they were both 'trapped' and were in 'the same boat.' She said that now was the time and place to be truthful about this, since now 'we are all fighting for the same cause.'

"HIRSCHFELD said that he had been fighting for causes all his life. He told BEKER that she was 'pretending,' and that he did not want to be part of her cause. HIRSCHFELD said that he had agreed to see BEKER, now this was done, and he said he must ask that she leave.

"At that point BEKER was escorted from the interview room."

14. Exhibits 169 (id.), 177 (id.) and 188 (id.) taken together plainly disclosed to the defense during the trial and one week before the case went to the jury (Motion 374–381) the following facts:—

(a) That Mrs. Beker and Hirschfeld had a confrontation in his West Berlin office on September 27, 1957;

(b) That at the time of the said 1957 confrontation Hirschfeld was an official of the West Berlin Government;

(c) That, while Mrs. Beker said she immediately and positively identified Hirschfeld at the said 1957 confrontation, Hirschfeld flatly denied knowing her;

(d) That there was a second confrontation between Mrs. Beker and Hirschfeld, this one occurring in New York on January 29, 1960;

(e) That, at said 1960 confrontation, Hirschfeld called Mrs. Beker "a liar"; that Hirschfeld insisted that he had never met her at any time while he worked at OSS, that he never gave her any information, and that all of her accusations of him were false; and that he could not understand why she would make any such statements about him.

15. There is no evidence that the Government suppressed the aforesaid evidence either wilfully, negligently, inadvertently or otherwise.

In order to make the charge of suppression more palatable, the defense disavows any imputation of sinister conduct to the prosecutor and, instead, attributes the suppression to "mistake", "inadvertence" or "confusion." (Motion 133, 179, 202.)

However, the very position taken by the defense as to what happened necessarily amounts to an accusation that the two Assistant United States Attorneys who tried this case committed the following acts:

(1) They flatly violated the court's specific rulings by excising selected parts relating to Hirschfeld and then, having excised such Mrs. Beker-Hirschfeld references, turned over the emasculated exhibits to the defense.

(2) The Assistant United States Attorneys falsely stated on the trial record that they had furnished the exhibits as ordered by the court.

(3) When the "incomplete" exhibits had been read by defense counsel and returned by them to the prosecutors, the latter substituted complete exhibits for those returned, and placed the complete exhibits in the Government's security file.

(4) The Assistants then produced before this Court on the hearing of this motion for a new trial, the complete exhibits.

Despite the disavowal by the defense of the charge of intentional wrongdoing, the pervasive innuendo is that the Assistants perpetrated a hoax on the defense and the Court by a species of legerdemain. What the defense charges is not true. The prosecution did in fact furnish the defense with exhibits in full and complete compliance with the court's order. These exhibits contained all of the Mrs. Beker-Hirschfeld references that now appear in those exhibits. It is the defense, not the prosecution, who is attempting to impose upon the court.

16. During the trial, defendant was informed by the Government that Hirschfeld was believed to be in West Berlin then, and that he had just been interviewed there by a newspaperman (Trial 1426). Government counsel did not know where Hirschfeld was actually living at the time of trial (Motion 420, 430).

At first, the defense claimed on this motion that the prosecution made "knowing misstatements of fact" as to Hirschfeld's whereabouts (Motion 202). Subsequently, the defense modified this claim to an assertion that the prosecutor "did know or should have known" where Hirschfeld was living when the Government made the statement to the Court (Motion 335).

Regardless of the verbalization of the defense claim, the Government did not—wilfully, negligently or inadvertently—make any false or misleading statement to the prejudice of the defendant.

17. Defendant has failed to prove facts showing diligence on his part in procuring the allegedly new evidence concerning Hirschfeld. Defendant had every opportunity at the trial to procure Hirschfeld's testimony in person or to ask for leave to take Hirshfeld's deposition abroad.

18. The defendant was informed on January 11, 1961 that Mrs. Beker was to be a Government witness. She was called to the stand on July 6th (Motion 232, 238). The defense never attempted to interview her and find out what her testimony would be (Motion 111, 114, 232–33).

Mrs. Beker's name and address were set forth on the list of prospective prosecution witnesses furnished to the defense on January 11, 1961. The list was supplied under authority of Title 18 U.S. C. § 3432 (based on Title 18 U.S.C. [1940 ed.] Section 562; derived from Act April 30, 1790, Ch. 9, Section 29, 1 Stat. 118).

Mr. Friedman was aware of this statute. In his moving affidavit, sworn to December 22, 1960, Mr. Friedman, applying under Title 18 U.S.C. § 3432, said (in paragraph "7"):

"To facilitate proper preparation for trial, it is necessary that the list

of Government witnesses *and their places of abode be furnished promptly.*" (Emphasis supplied.)

■ The purpose of the statute "is to afford the accused an opportunity to endeavor to ascertain what testimony he will have to meet and to prepare to meet it." See Claff v. United States (8th Cir. 1927) 18 F.2d 906, 907; Logan v. United States (1892) 144 U.S. 263, 304, 12 S.Ct. 617, 36 L.Ed. 429; Holmes v. United States (1926), 56 App.D.C. 183, 11 F.2d 569, 572; United States v. The Insurgents of Pennsylvania (Cir. Ct., Dist. of Penn. 1795) 2 Dallas 334, 341, 2 U.S. 334, 341, 1 L.Ed. 404; United States v. Stewart (Cir. Ct., Dist. of Penn. 1795) 2 Dallas 343, 2 U.S. 343, 1 L.Ed. 408; Cf. United States v. Aviles (S.D.Cal.1915) 222 F. 474, 477.

When, in June 1961, the prosecution served Mr. Friedman with a supplementary list of prospective prosecution witnesses, Mr. Friedman expressly told the Court that he wanted adequate time to interview these witnesses.[4]

4. This appears in the minutes of the pretrial proceedings on June 16, 1961, as follows [Emphasis Supplied]:

"[Mr. Friedman]: Here we have a fresh batch of witnesses, some of whom live in the vicinity, five of whom live in New York City in the metropolitan area. *I want to make appointments with them, go around and see them and hear what they have to say, what information they may have which will bear on the evidence.* I don't know what their testimony will be. I don't see why at the eleventh hour in a case which has been pending six months, *where the Government has been able to give me other witnesses' names six months ago* that I should now be faced with this. This isn't a game. The purpose of the trial is to reach a just determination and I think in all fairness I should be permitted a continuance. While the statute technically says not less than three days, that doesn't deprive the Court of its discretion to allow the defendant a reasonable time to prepare his defense. This is potentially a capital case." (Pretrial record, June 16, 1961, pages 185–186.)

"THE COURT: I want to comply not only with the letter of the statute that requires furnishing the defendant with a list of witnesses, but I want to comply with the spirit of the statute as well, and there is no doubt, nor is it suggested by Mr. Friedman, that there hasn't been technical compliance with the statute.

"Mr. Friedman says that he would like to have a *reasonable opportunity to interview or attempt to interview these witnesses who are on the supplementary list,* and it occurs to me that when, as and if the Government intends to call any of the witnesses on the supplementary list, and I recognize that the Government may change its mind as to calling any of these witnesses, but assuming that the time comes when the Government does intend to call one or more of the witnesses on the supplementary list, that perhaps a day or two before these witnesses are called and while they are in the Southern District of New York arrangements be made, perhaps through consultation with the Court and counsel, because I presume we'll be on trial, if the witnesses consent to be interviewed, *that Mr. Friedman have the opportunity to interview these witnesses* who will be in or near the Courthouse and he would be given the opportunity to interview them, as I say, if they consent to be interviewed, at, say, the Bar Association or the New York County Lawyer's Association, or some place where there won't be any suspicion about the room being bugged or wired.

"So that before any of these witnesses take the stand, meaning the witnesses on the supplementary list, two things will be accomplished for the protection of the defendant:

"First, that Mr. Friedman will be notified that they are being called and that he may, if he doesn't know them or his client doesn't know them, be introduced to them so that he meets them face to face and talks to them alone *to find out whether they consent to be interviewed, and, if so, to interview them, and I think perhaps in that way the rights of the defendant may be vigilantly protected by the Court by some such arrangement.*

"I'm going even beyond the statute. Let's assume in the case of this Mrs. Maria Meyer-Sevenich, who apparently lives in Germany, the woman is brought to the United States and the Government intends to use her as a witness. I would be willing to suggest, because I don't know the Government's position, that in case she is called that Mr. Friedman be notified a day or two in advance, perhaps two days in advance, and be told that 'This woman is here; we are going to call her as a witness; we'll be glad to introduce you to her; you can talk to her any place you want outside the building,'

Mr. Friedman fully realized the importance of interviewing the prospective Government witnesses as soon as possible, and he earnestly sought and obtained the opportunity to do so.

However, on the hearing of the motion for a new trial, Mr. Friedman and Mr. Brill—in an endeavor to explain their failure to interview or attempt to interview Mrs. Beker (Motion 111–112)—en-

and in that way accomplish what is the objective of the statutory provision.

"What I am suggesting is an extemporaneous proposition designed, on the one hand, to eliminate a protracted adjournment and, on the other hand, to achieve a measure of protection of the defendant's position as advocated by Mr. Friedman.

"MR. FRIEDMAN: May I say one other thing on that subject, your Honor? Interviewing a witness in the course of a trial, after a number of other witnesses have testified, is never as satisfactory as *an opportunity to interview a witness before a trial commences*, because as your Honor well knows, in a case of this kind especially, when conspiracy is alleged, the testimony of one witness may have some bearing upon the testimony of another, and if I find out on the 10th day of the trial that witness so and so has such and such information which might have been very helpful had I known it a week before, the entire effect of *the opportunity to interview witnesses* is in a sense curtailed. I think your Honor understands what I mean.

"THE COURT: Yes, I understand your argument.

"MR. FRIEDMAN: I would like it as far as possible before the commencement of the trial, so that when one witness testifies and what I have learned from one witness has a bearing upon another witness' testimony, I will have a chance."

(Pre-trial record, June 16, 1961, pages 191–195),

"THE COURT: * * * The issue before me now, stated in plain English, is whether I should grant Mr. Friedman's request for an adjournment to some time in July or August.

"Mr. Friedman has stated three reasons for that request, as I understand it: Because he has an engagement in the Court of Appeals on Monday; secondly, that he needs more time to prepare, and, third, *that while he has received timely the supplementary list of Government witnesses, he has not had an opportunity to contact or interview these witnesses.*

"* * * As to the third reason that you need time to interview the nine witnesses whose names and addresses appear on the supplementary list, the Government witnesses, as to that I'm going to put a question to Mr. Casey:

"Mr. Casey, are you adverse to the suggestion I made about letting Mr. Friedman

know a couple of days in advance when you are calling these witnesses?

"MR. CASEY: We have no objection at all to it, your Honor, if the witnesses, of course, are willing to talk to him.

"THE COURT: Naturally, if they are not going to be called the whole thing becomes academic. If any one of the witnesses on this list are going to be used as Government witnesses—I'll participate in the conference so that we can make a record—are you willing to let Mr. Friedman know, say, two days in advance, perhaps three days in advance?

"MR. CASEY: As best as I can estimate when it comes, that is two or three days. Yes, your Honor, we'd be willing to.

"THE COURT: Let's say three days in advance, before you call any one of these witnesses, there will be a conference, and you'll let me know so I can meet with counsel, and Mr. Friedman will be advised that you are planning to call one or more of these witnesses, and you will afford him the opportunity to meet these witnesses, to talk with them at the Bar Association or at the New York County Lawyers' Association or on Bedloes Island or some other place where he doesn't have to worry about the room being bugged or wired, so that he has free access to talk to these people, if they want to talk to him.

"MR. FRIEDMAN: How can that be, if the case is on trial?

"THE COURT: I will adjourn the trial to enable you to interview and talk to any of these witnesses.

"MR. FRIEDMAN: Getting the list of names before the trial doesn't mean a thing.

"THE COURT: The law only requires

"MR. FRIEDMAN: I understand. You spoke about the spirit of the law. *If the spirit of the law is fulfilled by an opportunity to interview witnesses* during the trial, I guess—

"THE COURT: I am only a judge. I am not Congress. Congress says you are entitled to three days' notice and you got three days' notice. I am willing to go beyond that.

"MR. FRIEDMAN: Your Honor doesn't give me more notice by *permitting me to interview witnesses* during the trial.

"THE COURT: Isn't that better than not interviewing them at all?

gaged in a volte-face and proffered the excuse that it would have been "improper" for them to interview her or any prospective Government witnesses. Mr. London said (Motion, 112) that Mr. Friedman "could not, with propriety, have attempted to interrogate Mrs. Beker." Mr. Brill likewise declared (Motion 232–233) that he did not attempt to interview Mrs. Beker because "it would be improper."

Actually, the Canons of Professional Ethics, Canon 39, relevantly provides:

"A lawyer may properly interview any witness or prospective witness for the opposing side in any civil or criminal action without the consent of opposing counsel or party."

The same provision almost verbatim is contained in Canon 10 of the Code of Trial Conduct of the American College of Trial Lawyers. See 12 Syracuse L.Rev. 467–468 (1961); 43 A.B.A.J. 223, 225 (1957).

19. Hirschfeld's name was included in the questions on the voir dire submitted by the Government and put to the jury panel by the Court (Court's Exh. III; Trial [June 19, 1961] 46; Motion 159–160, 236–237).

The memorandum of voir dire questions proposed by the Government had been served on defense counsel before the trial began (Trial [June 19, 1961] 12).

At no time during the trial did defense counsel attempt in any way to ascertain Hirschfeld's further identity or whereabouts, according to both Mr. Friedman and Mr. Brill (Motion 208–240).

20. Section 3500 statements furnished to defendant after Jack Soble testified on direct examination were replete with references to Herschfeld's name and put defendant on notice from the beginning of the trial as to Hirschfeld's importance in the case (Motion 207, 236; Trial Exs. 37 id., 44 id., 46 id., 53 id., 88 id.; also Soble's Grand Jury testimony, Trial Ex. 17 id.; Trial pp. 2097–98). Other exhibits marked in connection with Jack Soble's testimony, as well as the testimony itself, pointed up to the role Johanna Beker played in transmitting information from O.S.S. to the defendant (Trial 402, 422–23; Tr. Exs. 82 id., 104 id., 106 id., 108 id.).

21. Johanna Beker's testimony further emphasized Hirschfeld's role in the case and brought it before the jury (Trial 1196–1210, 1240–48).

22. Mrs. Beker also testified on direct that after her espionage meetings had ceased in 1945, "I saw Dr. Hirschfeld subsequently in Berlin and in New York." (Trial 1210.) Although Mrs. Beker was extensively cross-examined concerning her activities with Hirschfeld (Trial 1283–92, 1298–99, 1303–08, 1322, 1325), defense counsel, as a matter of professional judgment, deliberately refrained from cross-examining her about her two post-1945 meetings with Hirschfeld (Motion 239).

Mr. Brill testified that, *during the trial*, there was direct testimony by Mrs. Beker that she had seen Hirschfeld on two occasions—"I think it was in Berlin in 1957 and once again in January, I think, of 1960" (Motion, 220).

The dates "1957" and "1960" were *not* mentioned by Mrs. Beker in her trial testimony or by any other witness in the entire record. Mrs. Beker testified

"MR. FRIEDMAN: Not much. I would like to *know what they are going to testify before the first witness has testified,* otherwise that witness may go to a foreign country and that is the end of the witness, and I can't ask him about any of the dealings with these dealings, because I haven't ascertained that. * * * "MR. FRIEDMAN: I will accept anything that is helpful to my client. I'm

merely stating that it is not as good as any opportunity to be able *to interview a witness before trial.*

"THE COURT: The suggestion is reinstated.

"Mr. Casey, do we have your consent to reinstate it?

"MR. CASEY: Yes."

(Pre-trial record, June 16, 1961, pages 200–210.)

(Trial, 1210): "I saw Mr. Hirschfeld subsequently in Berlin and in New York." The only places where the dates "1957" and "1960" are mentioned are in the portions of the exhibits that defense counsel now claim they never read or saw. Mr. Brill's testimony would indicate that he read the portions of the exhibits that the defense claims were never furnished to it.

23. Included in Beker's cross-examination was extensive interrogation based on the Section 3500 statements furnished to the defense (Trial Tr. 1280, 1294, 1308–13, 1317–22, 1326–34).

24. As the Government was about to close its case on July 11, 1961, the Court called counsel up to the bench and raised the question of whether the defense planned to argue to the jury that an inference that the testimony of Hirschfeld and Baerensprung would be adverse to the Government would be drawn from the Government's failure to produce them at trial. (Motion 241–242.) In that context, the Court asked the Government where Hirschfeld and Baerensprung were (Trial 1425; Motion 242). The Government said that Baerensprung was dead and then pointed out that it believed that Hirschfeld was in West Berlin and that he had been interviewed there by a newspaper man that week (Trial 1426). Defense counsel did not attempt to elicit further information from the Government (Motion 218).

At no time during the foregoing colloquy in the presence of Mr. Friedman and Mr. Brill was a single question asked by defense counsel, nor was any request made by defense counsel with respect to Hirschfeld (Motion 244–245). The purpose of the statement made by Mr. Casey was to explain why one Boris Morros was not being called as a Government witness (Trial 1425) viz., that Morros was in the hospital; that Baerensprung was dead; and that Hirschfeld was outside the jurisdiction of the United States.

25. During the course of the trial, defense counsel made no efforts to find out where Hirschfeld was living (Hearing Tr. 208, 240), and never asked for additional time to obtain such information, if it was needed.

26. In argument on the defendant's motion to dismiss at the end of the Government's case, defense counsel stated that the prosecution had not produced Hirschfeld or Baerensprung to corroborate Mrs. Beker (Trial, 1456–1457). When the Court referred to the Government's statement at the bench that Hirschfeld was outside the country, defense counsel replied "Well, that is only hearsay." The Court then stated: "It is not being argued," and defense counsel replied "No." (Trial 1457.)

27. In summation to the jury, the defense adopted the position that the Government had failed to prove that.the national defense was involved in the material supplied by Hirschfeld and Baerensprung to the defendant via Mrs. Beker (Trial 1510–24). Although challenging Mrs. Beker's credibility, the defense never argued that the Government had failed to prove that Hirschfeld had given any information to Mrs. Beker.

On cross-examination of Mrs. Beker, the defense attempted to establish that the reports that Mrs. Beker received from Hans Hirschfeld related only to German political activities in the United States, as distinguished from national defense matters (Trial 1292–1293, 1294, 1295, 1298). The defense position was not to deny that the defendant had received reports from Hirschfeld through Mrs. Beker, but that the reports did not relate to national defense. (See, for example, Trial 1305–1306, 1322, 1325.) Mrs. Beker had identified Hirschfeld by photograph (Trial 1199; Trial Exh. 147); and she described how she had worked together with Hirschfeld and the defendant (Trial 1196–1203; 1206–1210; 1240–1248).

The defense did not request the Court to examine Mrs. Beker's Grand Jury testimony as a preliminary to obtaining portions disclosing prior inconsistencies.

28. After the jury returned its verdict, defendant apparently had no difficulty in locating Hirschfeld in West Berlin.

No credible evidence was adduced by the defense at the hearing proving that Hirschfeld could not have been located and spoken to by the defendant before the end of the trial with the exercise of reasonable diligence.

29. The evidence which defendant offered at the hearing of this motion pertaining to Hans Hirschfeld is not in fact newly discovered, i. e., not discovered since the trial.

30. The Court advised counsel that a reasonable adjournment would be granted in order to enable the defense to arrange for Hirschfeld's appearance as a witness upon the hearing of this motion (Motion, 165–173).

The Department of Justice expressed formally its willingness to give Hirschfeld immunity in order to have him appear as a witness upon the hearing of this motion (Motion, 345–346).

Hirschfeld, however, would not appear here unless he were given advance assurance of immunity against possible prosecution for alleged perjury arising out of his prospective testimony upon the hearing of this motion. (Motion, 346–347, 350, 351–353, 357–358; Court's Exhibit IV.)

In view of the foregoing and for reasons expressed in an opinion dictated into the record (Motion, 546 et seq.), the Court denied the defendant's application under Rule 15, F.R.Crim.Proc., to take Hirschfeld's deposition for use on this motion. Said opinion is now set forth as an appendix to this decision.

31. Motion Exhibit H (id.) [Motion, 283, 311] consists of 120 pages of Hirschfeld's testimony before the Grand Jury, S.D.N.Y., on February 5th and 8th, 1960. At page 04534, he testified, "I don't know why she [Mrs. Beker] pretends to have met me, why she says all the lies about me. I can only say I don't know. I have no explanation whatsoever for that."

Hirschfeld told the Grand Jury that he never met or spoke to Mrs. Beker at any time prior to the 1957 confrontation in Berlin; that he had called her "a liar" in 1957; that he never gathered and transmitted any information in behalf of the Russians; that he never obtained information relating to the production or manufacture or code name of any secret weapon being undertaken by the United States Government; and that he never knew, met or made contact with the defendant. (Pages 04515–04521, 04524.)

Hirschfeld said that, since October 1957, he discussed Mrs. Beker's statements about him "with the people who were working with me in the office, namely, Mrs. Stone, S-t-o-n-e, for instance. I discussed, by the way, with Mr. Stone the whole affair long before I came to the States, and with others, too." (Pages 04533–04534.)

Motion Exhibit I (id.) [Motion, 285] is the same as Exhibit 187 (id.) marked on the trial. It is the F.B.I. interview report dated January 29, 1960. The first page covers an interview with Hirschfeld on that date. The 2nd and 3rd pages and the first three paragraphs on the 4th page cover Mrs. Beker's confrontation of Hirschfeld on that date and the statements made at that time by Mrs. Beker and Hirschfeld. The balance of the 4th page and the 5th page cover Hirschfeld's statement after the confrontation. The portions of Exhibit 187 (id.) ordered to be furnished to the defense upon the trial are contained in Exhibit 188 (id.). [Motion, 312–314.]

Motion Exhibit K (id.) is an F.B.I. report dated April 26, 1960. It covers interviews with Hirschfeld on January 26, 27, 28 and February 1, 1960. [Motion, 311–311A.]

Motion Exhibit L (id.) is a 37-page document, covering interviews with Hirschfeld in West Berlin on October 29, 30 and 31, 1959 by Victor C. Woerheide, of the U. S. Department of Justice. [Motion, 319.]

Motion Exhibit M (id.) is a 21-page summary of interviews with Hirschfeld on October 29, 30 and 31, and November 4, 7 and 8, 1959 in West Berlin by repre-

sentatives of the U. S. Department of Justice. [Motion, 319.]

Motion Exhibit X (id.) is substantially the same as "Exhibit I" attached to the motion papers. It is a statement by Hirschfeld "To the Government of the United States of America."

Motion Exhibit Y (id.) is a 9-page report dated October 24, 1957. It covers an interview with Hirschfeld in Berlin on September 27, 1957 and Mrs. Beker's confrontation of him on that date.

Motion Exhibit Z (id.) is a 3-page report by Victor C. Woerheide, U. S. Department of Justice, covering interviews with Hirschfeld on October 29, 30 and 31, 1959.

Motion Exhibit AA (id.) is a 2-page supplementary report by Victor C. Woerheide covering contacts with Hirschfeld on November 4, 7, 9 and 10, 1959.

32. The evidence which would be produced through Hirschfeld is not of such nature that, on a new trial, it would probably produce an acquittal (accepting the statements set forth in Exhibits I, J, and K of Mr. Brill's moving affidavit as containing the substance of the evidence which would be produced through Hirschfeld).

(a) Defendant has not shown that Hirschfeld would come to the United States to testify were the Court to order a new trial. The statements of counsel at the hearing (including Hirschfeld's own counsel) indicate, on the contrary, that he would refuse to come unless the Government granted him immunity from arrest while here even for possible perjury (Motion 296–306, 345–55, 356–59; Court Ex. IV).

(b) If a new trial were ordered, and if Hirschfeld's testimony were to be taken in West Berlin for use at the new trial, his testimony by deposition would be subject to the infirmities alluded to in the Court's opinion denying the motion to take Hirschfeld's deposition for use at the hearing of this motion (Motion 546–550).

(c) Taking the trial record as a whole, the Court cannot find that Hirschfeld's testimony (if it could be presented and assuming that he would deny the material parts of Mrs. Beker's testimony concerning him) would probably produce an acquittal for the defendant.

33. Br. Brill, the defendant's trial counsel, has been practicing law for 30 years. He specializes in trial work (Motion, 228).

Mr. Friedman, the defendant's co-trial counsel and attorney of record, has been a member of the Bar for 36 years. He has participated in several hundred criminal cases, including about a hundred federal criminal cases. He has handled about fifty appeals in the Court of Appeals for this Circuit (Motion 142–143).

Upon the trial, the defendant was represented by able and experienced lawyers.

### JACK SOBLE

With respect to the Jack Soble phase of the motion, the Court makes the following findings of fact on the basis of the overwhelming preponderance of the credible evidence:

1. The evidence pertaining to Jack Soble's medical reports which defendant offered at the hearing is not in fact newly discovered, i. e., not discovered since the trial.

2. Defendant knew, at the trial, of Jack Soble's mental condition, his suicide attempt and the fact that he had had a series of shock treatments (Motion 148–155, 228, 230–231). This was brought out on cross-examination (Trial 589–98). His mental condition was argued to the jury in defense summation (Trial 1509–1510, 1514).

The Court charged the jury specifically on the issue raised by defense counsel's claim "that Jack Soble was utterly irresponsible, perjurious, and mentally incompetent" (Trial, 1609).

3. Defendant's trial attorneys deliberately refrained from subpoenaing medical or hospital records of Jack Soble because he felt they were not necessary to defendant's case (Motion 147, 149–154, 229–31).

The defendant himself is an experienced psychiatrist (Motion, 289). Before and during the trial, the defendant recognized the availability and the forensic-medical significance of any medical reports on his brother Jack in Bellevue Hospital and the Medical Center for Federal Prisoners, Springfield, Missouri.

The defense decision made during the trial not to subpoena or request the production of medical reports and the Zborowski record and not to put a psychiatrist on the stand was a calculated strategy, a deliberate decision in the exercise of professional judgment.

4. Defendant has failed to prove facts showing diligence on his part in procuring the allegedly new evidence concerning Jack Soble's medical reports.

5. At the trial, the Government informed the defendant that Jack Soble had been a witness in the case of United States v. Zborowski, 2 Cir., 271 F.2d 661 (Trial 508, 510).

Assistant U. S. Attorney Hyde said:

"In that connection I think I should point out for the record that the defendant Jack Soble testified as a Government witness in the case of United States v. Zborowski which was held here in this court, I believe, in November 1958".

(Trial 508). The case was identified as having been tried before Judge Cashin (Trial 508). Mr. Hyde further stated: "Your Honor, to continue with my remarks on the Zborowski testimony, I simply want to point out that the witness did testify there, and, of course, that testimony is a matter of public record, part of the files of this Court, and is easily available to defense counsel so that the Government does not feel that that is testimony which it is required to produce" (Trial 510). Mr. Hyde added: "I just wanted to make it clear that that does exist" (Trial 510). The Court said: "I am sure the defendant's counsel knows about it" (Trial 511). The defense made no comment.

Defense counsel admit that they deliberately did not read the Zborowski record (Motion, 143–144, 156–158).

Reference to the transcript of that case (which is a public record on file with the Clerk of this Court) would have identified most of the medical reports which defendant now describes as newly discovered. Trial counsel deliberately refrained from examining the record in the Zborowski case. (Motion 143–144, 225–226, 228–229.)

6. In connection with the production of Section 3500 material, the Court cited the opinion of the Court of Appeals in United States v. Zborowski, 271 F.2d 661 (2d Cir. 1959). The text of that opinion also put defendant on notice concerning the availability of medical reports concerning Jack Soble. See 271 F.2d at 667:

"The government points out that Soble was subjected to intense and detailed cross-examination for nearly three days; *that defense counsel had available for this purpose the reports of several doctors at both state and federal institutions including the complete medical treatment dossier maintained at the Medical Center for Federal Prisoners; * * *.*"

7. The defense never requested the government to produce Jack Soble's medical reports nor did it subpoena them (Motion, 229–30).

Mr. Friedman knew that hospital and medical records can be subpoenaed and thus produced in court (Motion, 147).

Mr. Friedman was aware that Jack Soble had been confined in the M.C.F.P. at Springfield, Missouri, and at Bellevue Hospital; that he had received shock treatments; and that certain named doctors had treated him. (Trial, 589–598, 590; Motion, 149–154.)

Mr. Friedman admitted that he never attempted to obtain any medical or hospital records pertaining to Jack Soble's mental condition, despite the information on that subject brought out on the trial. (Motion, 154.)

8. Defendant has not shown that the reports in question were unavailable to him at trial through the exercise of reasonable diligence.

Defendant's present attorney conceded upon the hearing of this motion that, if the defendant's trial counsel had pursued this matter diligently, they would have discovered the evidence concerning Jack Soble's mental condition. (Motion, 249, 251, 280.)

9. The Jack Soble medical reports are cumulative evidence and impeaching. Upon the trial, Jack Soble was cross-examined at length concerning his mental condition "in jail"; his suicide attempt; his series of shock treatments; his stays in Bellevue Hospital psychiatric ward and at the M.C.F.P., Springfield, Missouri; and the treatments at those hospitals. (Trial, 589–598.)

10. The Jack Soble medical reports (Motion Exhibits for identification E, F, G, J, V and W) are not of such nature that on a new trial they would probably produce an acquittal.

Exhibit E (id.), "Special progress report" dated October 16, 1958, by Ernest Bergel, M.D., Staff Psychiatrist at M.C.F.P., contains the following statement:

"It is the opinion of the staff that this patient has made substantial improvement and that he is fully competent to testify as a witness."

Exhibit F (id.), "report of psychiatric examination" dated April 21, 1959, by Dr. Bergel, deals with Jack Soble's condition ("typical post shock syndrome") following electric shock treatments received since March 1959.

Exhibit G (id.), includes a report entitled, "First Presentation at the Medical Center" dated July 8, 1958; a report entitled, "Physical Examination and Correlated History" made on April 18, 1958; a 6-page report by Dr. Donald B. Rinsley, Staff Psychiatrist of, "Neuropsychiatric Examination."

Exhibit J (id.), is a 5-page report dated February 24, 1958, by Dr. M. B. Root, U.S.P.H. Service psychiatrist, to Warden J. C. Taylor. The diagnosis was "psychoneurosis-depressive reaction with anxiety and hypochondriasis." [Motion, 310.]

Exhibit V (id.) is a letter dated January 11, 1960 from the Chief of the Neuropsychiatric Service, M.C.F.P., Dr. Joseph C. Sturgell, to Acting United States Attorney Morton S. Robson. Referring to Jack Soble, the final sentence of the letter reads: "His mental condition at this time is such that he should be able to function adequately as a witness."

Exhibit W (id.) is a report (dated January 1960) by Dr. T. L. Clanon, Staff Psychiatrist at M.C.F.P., Springfield, Missouri. Inter alia, the report refers to Jack Soble's job performance as "increasingly superior", "helpful to other patients", "congenial with coworkers and supervisors", "he has shown significant improvement in his ability to function", "His work has been superior enough to prompt recommendation for meritorious award".

11. The testimony of Dr. Donald B. Rinsley appears in the Zborowski record. The report of his final diagnosis of Jack Soble was marked as Defendant's Exhibit X in the Zborowski trial. In the course of his medical testimony in the Zborowski trial, he said that he was of the opinion that Jack Soble "is capable of telling the truth". (Motion, 258); that "the determination of whether anything he [Jack Soble] said was true or not would have to rest upon essentially the same standards that you might use or that the jury would have to use"; that whether a particular statement of Jack Soble was or was not true "would have to be determined by the situation which was being described and the particular recall of that situation which Mr. Soble was making at the time." (Motion, 259); that people who are seriously ill can still tell the truth and are competent to testify in court (Motion, 261); that "most definitely" the jury could determine the credibility of such a witness (Motion, 261–262).

The medical report dated October 16, 1958 was read, at least in part, into the

Zborowski trial record (Motion, 262–263).

### FORMER OSS EMPLOYEES

With respect to the "former OSS employees" phase of the motion, the Court makes the following findings of fact on the basis of the overwhelming preponderance of the credible evidence:

1. Upon the hearing of this motion, and in compliance with the Court's direction following defendant's request, the Government produced the following F.B.I. reports of interviews with former OSS personnel: Defendant's Exhibits N, O, P, Q, R, S and BB (all marked for identification).

Exhibit N (id.) consists of pages 49–60 of Trial Exhibit 162 (id.). The indicated pages cover F.B.I. interviews with four former OSS employees: Dorothea Cronin (on May 28, 1957); Catherine V. Glynn (on May 25, 1957); Caroline Hepner (on May 27, 1957); and Emmy C. Rado (on June 4, 1957). [Motion, 361.]

Exhibit O (id.) consists of pages 32–38 of F.B.I. report dated August 28, 1957. The indicated pages cover interviews with three former OSS employees: Frederick C. M. Kempner (on May 29, 1957); Hans J. Meyer (on May 24, 1957); and Alessandro Moro (on May 24, 1957). [Motion, 366.]

Exhibit P (id.) consists of pages 2–4 of F.B.I. report dated October 4, 1957. The indicated pages cover an interview with a former OSS employee, Felicia G. Bock. [Motion, 366.]

Exhibit Q (id.) consists of pages 11 and 12 of F.B.I. report dated October 30, 1957. The indicated pages cover an interview with a former OSS employee, John Botton on September 10, 1957. [Motion, 367.]

Exhibit R (id.) consists of pages 28–42 of F.B.I. report dated April 9, 1958. The indicated pages cover interviews with nine former OSS employees: Mary A. Homans (on February 17, 1958); Felicia G. Bock (on February 17, 1958); Joseph Botton (on February 13, 1958); Dorothea Cronin (on February 13, 1958); Catherine V. Glynn (on February 13, 1958); Caroline Hepner (on February 11, 1958); Frederick C. M. Kempner (on March 6, 1958); Hans J. Meyer (on February 14, 1958); Alessandro Moro (on February 12, 1958). [Motion, 368.]

Exhibit S (id.) consists of pages 12–15 of F.B.I. report dated June 17, 1958. The indicated pages cover an interview with former OSS employee, Emmy C. Rado, on March 9, 1958. [Motion, 368.]

Exhibit BB (id.) is an F.B.I. report dated July 1, 1959, covering an interview with a former OSS employee, Maria Deutsch on June 19, 1959.

None of these F.B.I. interview-reports with former OSS personnel were turned over to the defense during the trial; and there never was any request by the defense for any such reports during the trial. (Motion, 525–526.)

2. Upon the hearing of this motion, defendant called Caroline Hepner (Motion, 458ff, 518ff) and Charlotte Stone (Motion, 477ff), two former OSS employees who had worked in the New York Biographic Records Section of OSS. Their cumulative testimony described Hirschfeld's articulated political views as a German Social Democrat, and painted the picture of Hirschfeld's official OSS duties as confined to office research and indicated the limited kind of information that came within the official activities of the Biographic Records Section in which he worked. The substance of such testimony is that neither the Biographic Records Section nor Hirschfeld had access officially to secret national defense weapons information.

The defendant also called H. Stuart Hughes, who was attached as an Army officer to OSS during the period from the beginning of 1942 to the beginning of 1946 (Motion, 50ff). During most of that period, he was outside the United States. He never visited the New York office of OSS. He never met, saw or spoke to Hirschfeld (Motion, 68–69). He had no knowledge whether or not top secret information was available in the

New York office of OSS (Motion, 84). He himself "Knew virtually nothing about what the highly-secret branches [of OSS] were doing" (Motion, 54). He said that nothing relating to American weapons ever went to OSS (Motion, 57). He described the tenets of the German Social Democrats as anti-Communistic.

Attached to the motion papers as exhibits annexed thereto are Exhibits C, E and G, consisting of two letters and an affidavit of Herbert Marcuse. Marcuse worked in the Washington office of OSS during the war. Marcuse was in Paris during the hearings on this motion, according to defense counsel (Motion, 38–40). At first, defense counsel said he could arrange for the taking of Marcuse's deposition (Motion, 39) but later defense counsel stated that he wanted to think over what he would do with Marcuse (Motion, 40–41, 163–165).

Assuming Marcuse would testify at this hearing in accordance with his prior letters and affidavit, such testimony would not materially alter any of the findings and conclusions contained in this decision.

3. The evidence of former OSS personnel which defendant offered at the hearing of this motion is not in fact newly discovered, i. e., not discovered since the trial.

The defendant's trial counsel deliberately chose, as a matter of professional judgment, not to locate and not to call any witness who had been connected with OSS; nor did he cross-examine the witness Otto Doering, called by the Government to describe the functions of OSS (Motion, 209, 233–234a).

Mr. Brill testified that it was his "professional judgment" that the defense "should not call an OSS witness or attempt to locate one" (Motion, 234–235).

4. Defendant has failed to prove facts showing diligence on his part in obtaining the testimony of the OSS witnesses who appeared at the hearing of this motion.

Each of these witnesses was available at the time of the trial. Defense counsel was able to locate them without difficulty when they attempted to do so (Motion, 79–82, 96–97, 502, 521).

5. The evidence produced by defendant at the hearing through the witnesses Hughes, Hepner and Stone is not of such nature that on a new trial it would probably produce an acquittal.

## GENERAL FINDINGS

1. Defendant was represented at the trial by two attorneys of his own choice. Both of defendant's attorneys were trial lawyers of long experience (Motion, 142–43, 228).

2. Defendant received a fair trial in every respect.

3. The Government did not withhold, suppress or conceal any facts, testimony or documentary evidence which the defendant was entitled to receive or have disclosed to him. The Government's conduct complied with all controlling standards and criteria of fairness, propriety and ethics.

4. The defense was not misled or lulled into inaction by anything the prosecutor said or did with respect to Hans Hirschfeld or Jack Soble.

5. The defense had the fair and reasonable opportunity in fact to obtain, develop and utilize the evidentiary material on the original trial that is now unjustifiably claimed to be newly discovered or to have been suppressed or concealed by the prosecution.

6. The exhibits that were turned over during the trial by the prosecution to the defense in accordance with the Court's rulings (all of which rulings were fully carried out by the prosecution) disclosed plainly and substantially the material and relevant facts that are contained in the following defendant's exhibits marked for identification upon the hearing of this motion for a new trial. Exhibits H, I, K, L, M, X, Y, Z, and AA. If the defense had acted with reasonable diligence upon the information disclosed to it by the exhibits turned over to it by the prosecution during the trial, the defense would have been able (if so ad-

vised) to have presented during the trial the facts that it now claims are newly discovered.

## GENERAL CONCLUSIONS OF LAW

The decisions dealing with "disclosure" and "suppression" of material evidence cannot usefully be considered en masse. See, generally, Comment, The Duty of the Prosecutor to Disclose Exculpatory Evidence (1960) 60 Col.L.Rev. 858; Note, The Attorney's Duties of Disclosure (1957) 31 St. John's L.Rev. 283.

An analysis of the authorities in their proper categories serves to place in proper focus the principles controlling the case at bar.

### I.

A new trial or a writ in the nature of habeas corpus or coram nobis will be granted where the prosecutor has deliberately suppressed material facts under circumstances amounting to fraud or overreaching of the defendant.[5]

### II.

A new trial or other appropriate relief will be granted to a defendant where a prosecution trial witness commits perjury to the knowledge of the prosecutor who takes no step to disclose the perjury to the court and the defense.[6]

5. Pyle v. Kansas (1942) 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 [state prosecutor used perjured evidence, knowing the evidence to be perjured, and also deliberately suppressed evidence favorable to defendant by coercing and intimidating potential defense witnesses. Defendant's application for a writ of habeas corpus had been denied without a hearing or opinion below. The Supreme Court reversed the affirmance of the denial of the habeas corpus application and remanded for further proceedings].

Wilde v. Wyoming (1960) 362 U.S. 607, 80 S.Ct. 900, 4 L.Ed.2d 985 [the Supreme Court remanded the case for a hearing, where defendant in a murder prosecution asserted that the prosecutor "wilfully suppressed the testimony of two eyewitnesses to the alleged crime which would have exonerated" him.].

United States v. Heath (D.Hawaii 1957) 145 F.Supp. 877, appeal dismissed (9th Cir. 1958) 260 F.2d 623 [indictment dismissed where Government agents lost defendant's corrected accounting records, in a tax evasion prosecution].

Curran v. Delaware (3d Cir. 1958) 259 F.2d 707, 713 [police officers destroyed a statement of defendant in a rape case].

Woollomes v. Heinze (9th Cir. 1952) 198 F.2d 577, 579, cert. denied 344 U.S. 929, 73 S.Ct. 499, 97 L.Ed. 715 [dictum re "connivance or actual fraud by the prosecution"].

United States ex rel. Almeida v. Baldi (3d Cir. 1952) 195 F.2d 815, 33 A.L.R.2d 1407, cert. denied 345 U.S. 904, 73 S.Ct. 639, 97 L.Ed. 1341 [deliberate suppression of vital evidence by an assistant district attorney who had urged a witness to omit certain facts in his testimony and who remained silent when the court charg-

ed the jury that the prosecutor had called all witnesses he could find, a statement that was untrue to the prosecutor's knowledge].

People v. Hoffner (Co.Ct.Queens Co. 1952) 208 Misc. 117, 122, 129 N.Y.S.2d 833, 837 [writ of coram nobis granted in a first degree murder case where the only prosecution witness who positively identified the defendant on the trial as the hold-up man testified on cross-examination that he had failed to identify defendant the first time he saw him in the police line-up because he could not and did not look at the defendant's profile on that first occasion whereas, in truth, the minutes of the police line-up proceedings clearly established that the witness did have a profile view of all those in the line-up at which he failed to identify the defendant ["the duty of revelation existed under the singular facts of this case, particularly since the unproffered minutes of the line-up go to the very heart of the only issue in the case, to wit: identification * * * "].

See United States ex rel. Thompson v. Dye (3d Cir. 1955) 221 F.2d 763, 768, 769; Application of Landeros (D.N.J. 1957) 154 F.Supp. 183, 185–187; United States v. Rutkin (3d Cir. 1954) 212 F.2d 641, 644, 645.

6. Napue v. Illinois (1959) 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217; United States v. Rutkin (3d Cir. 1954) 212 F. 2d 641; United States ex rel. Montgomery v. Ragen (N.D.Ill.1949) 86 F.Supp. 382; People v. Savvides, 1 N.Y.2d 554, 154 N.Y.S.2d 885, 136 N.E.2d 853 (1956).

See Dunn v. United States (6th Cir. 1957) 245 F.2d 407, 408.

Cf. Price v. Johnston, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1947) [where,

## III.

■ A new trial will be granted where the prosecutor negligently suppresses helpful defense evidence in violation of the court's order to turn over the documents containing such evidence and the existence of such suppressed documents was discovered by the defense after trial. United States v. Consolidated Laundries Corporation (2d Cir. 1961) 291 F.2d 563.

## IV.

■ A new trial will be ordered where the prosecutor fails to call the trial judge's attention to portions of a Government witness' grand jury testimony containing inconsistencies with the witness' trial testimony, as a consequence of which the defense is denied adequate opportunity to cross-examine and impeach the witness. United States v. Zborowski (2d Cir. 1959) 271 F.2d 661. Cf. People v. Schainuck (1941) 286 N.Y. 161, 165–166, 36 N.E.2d 94.

## V.

■ A new trial will be granted in light of the post-trial recantation by an important prosecution witness where the defense did not have the opportunity to meet the false testimony during the trial.[7]

## VI.

The granting of relief to the prosecution, where there has been post-trial discovery by the Government of a defense witness' trial perjury attributable to the defendants' fraud, is illustrated by United States v. The Shotwell Manufacturing Company (1957) 355 U.S. 233, 78 S.Ct. 245, 2 L.Ed.2d 234.[8]

## VII.

■ A new trial will be granted upon the prosecution's motion where there has been post-trial discovery by the Government of a key prosecution witness' lack of credibility or perjury committed at the trial. Mesarosh v. United States (1956) 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1.[9]

---

on an application for a writ of habeas corpus, it is charged that the conviction was obtained by the prosecution's knowing use of false trial testimony and the charge is not denied by the Government (334 U. S. at 275, 288, 292, 68 S.Ct. 1049), it is error for the district court to dismiss the application without a hearing.]

Communist Party of United States v. Subversive Activities Control Board (1956) 351 U.S. 115, 76 S.Ct. 663, 100 L. Ed. 1003 [while a proceeding to review an order of the Subversive Activities Control Board was pending before the Court of Appeals for the District of Columbia, the petitioner (Communist Party of the United States) moved for leave to adduce additional evidence that the petitioner had newly discovered subsequent to the administrative proceeding. The motion was denied by the Court of Appeals. The newly discovered evidence would establish that three Government witnesses had committed perjury in other cases involving substantially similar subject matter and that said witnesses were professional perjurers. "The Government did not deny these allegations" (351 U.S. at 121, 76 S.Ct. at 666). The Supreme Court called this an "uncontested challenge of

perjury" (351 U.S. at 123, 124, 76 S.Ct. at 667, 668). The Supreme Court remanded the case to the administrative agency to resolve the charges of taint, and to make a fresh determination on the merits, if taint were found.].

7. United States v. Flynn (S.D.N.Y.1955) 130 F.Supp. 412 [motion for new trial granted as to two defendants (Trachtenberg and Charney) who were unable during the trial to meet the false testimony; motion for new trial denied as to those defendants who failed to show that they could not meet the false trial testimony during the trial].

8. Government's motion to remand granted by the Supreme Court where evidence of a perjurious record attributable to the fraud of the defendants came into the Government's possession after the Government had petitioned for certiorari.

9. After certiorari had been granted (in a case where defendants' conviction had been affirmed), the Government moved in the Supreme Court to have the case remanded to the district court on the ground that a key Government witness had given testimony in other proceedings

## VIII.

 A motion for a new trial in a criminal case will be granted with caution and only in exceptional circumstances.[10]

## IX.

 In determining a motion for a new trial, the court possesses wide discretion.[11]

## X.

 The burden of proving grounds to support the motion for a new trial rests upon the defendant.[12]

## XI.

 A motion for a new trial will be denied where the defense fails to prove its due diligence to secure, before or during the trial, the allegedly newly discovered evidence.[13]

before other tribunals and that the Government "now has serious reason to doubt the truthfulness" of the witness in those proceedings (352 U.S. at 4, 77 S.Ct. at 3). The defendants moved for a new trial. The Supreme Court found that—regardless of whether the witness' untruthfulness constituted perjury or was caused by a psychiatric condition—the witness' "credibility has been wholly discredited by the disclosures of the Solicitor General" (352 U.S. at 9, 77 S.Ct. at 5); and the Supreme Court ordered a new trial.

10. United States v. Johnson (1946) 327 U.S. 106, 111, 66 S.Ct. 464, 90 L.Ed. 562; United States v. Costello (2d Cir. 1958) 255 F.2d 876, 879, cert. denied 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551; rehearing denied 358 U.S. 858, 79 S.Ct. 16, 3 L.Ed.2d 93; United States v. Hiss (S.D.N.Y.1952) 107 F.Supp. 128, 136–137, aff'd on opinion below, 201 F.2d 372 (1953), cert. denied 345 U.S. 942, 73 S. Ct. 830, 97 L.Ed. 1368 (1953); Weiss v. United States (5th Cir. 1941) 122 F.2d 675, 691;

Cf. United States v. Shotwell Manufacturing Co. (1957) 355 U.S. 233, 242, 78 S.Ct. 245, 251, 2 L.Ed.2d 234 ["A convincing showing is of course necessary to bring these principles into play."]

11. United States v. On Lee (2d Cir. 1953) 201 F.2d 722, 723, cert. denied 345 U.S. 936, 73 S.Ct. 798, 97 L.Ed. 1364; United States v. Troche (2d Cir. 1954) 213 F.2d 401, 403–404; and see dissenting opinion of Frank, C. J. at 404;

United States v. Senft (E.D.N.Y.1921) 274 F. 629, 630 ["A motion for a new trial, which is peculiarly addressed to the discretion of the court" was granted where the concept of "newly discovered evidence" was applied to the following fact-situation: after the jury found defendant guilty of bribing the prosecution witness but before defendant was sentenced, the prosecution witness was indicted for extortion. The district judge imposed sentence on the defendant and

granted a stay of execution of sentence, in order that defendant might have an opportunity to move for a new trial in the event that the prosecution witness should be convicted. That witness was thereafter tried and convicted. The district judge thereupon granted defendant's motion to set aside the verdict and for a new trial.];

Cf. Communist Party of United States v. Subversive Activities Control Board (1956) 351 U.S. 115, 125, 76 S.Ct. 663, 668 ["the Board has ample scope of discretion in passing upon petitioner's motion."].

12. United States v. Costello (2d Cir. 1958) 255 F.2d 876, 879;

United States v. Forzano (2d Cir. 1951) 190 F.2d 687, 689 ["insufficient showing of due diligence on the part of the appellant"];

United States ex rel. Darcy v. Handy (1956) 351 U.S. 454, 462, 76 S.Ct. 965, 970, 100 L.Ed. 1331 ["While this Court stands ready to correct violations of constitutional rights, it also holds that 'it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality.' (Citing cases)"].

13. United States v. Flynn (S.D.N.Y.1955) 130 F.Supp. 412, 421; United States v. On Lee (2d Cir. 1953) 201 F.2d 722, 723, no. 3; United States v. Costello (2d Cir. 1958) 255 F.2d 876, 879–881; United States v. Hiss (S.D.N.Y.1952) 107 F. Supp. 128, 135–136, aff'd on opinion below, 2 Cir., 201 F.2d 372 (1953), cert. denied 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368 (1953);

Cf. Green v. United States (1st Cir. 1958); 256 F.2d 483, 484, cert. denied 358 U.S. 854, 79 S.Ct. 83, 3 L.Ed.2d 87 (1958) [where the asserted knowledge of the prosecutor's subornation of perjury by a Government witness had been known to the defendant before he went to trial

## XII.

■ Where the allegedly newly discovered evidence was known to the defense or readily obtainable by it before or during the trial and the defense trial strategy was not to utilize such known or obtainable evidence during the trial, the decision by the defense to change its strategy after an unfavorable verdict does not render the evidence "newly discovered." [14]

but his lawyer, though informed thereof, did not press the issue during trial].

Cf. Nardone v. United States (1939) 308 U.S. 338, 342, 60 S.Ct. 266, 268, 84 L.Ed. 307 ["and if such a claim (illegally obtained evidence) is made after the trial is under way, the judge must likewise be satisfied that accused could not at an earlier stage have had adequate knowledge to make his claim. The civilized conduct of criminal trials cannot be confined within mechanical rules"].

14. United States v. Costello (2d Cir.1958) 255 F.2d 876, 879–881; United States v. Sobell (2d Cir. 1957) 244 F.2d 520, 524, cert. denied 355 U.S. 873, 78 S.Ct. 120, 2 L.Ed.2d 77 (1957), rehearing denied 355 U.S. 920, 78 S.Ct. 338, 2 L. Ed. 280; United States v. Capece (2d Cir. 1961) 287 F.2d 537, 538, no. 1; United States v. Peller (S.D.N.Y.1957) 151 F.Supp. 242, appeal dismissed 246 F.2d 537 (1957);

Application of Landeros (D.N.J.1957) 154 F.Supp. 183, 197, 198 ["Petitioner is in effect arguing that on a second go-round, he would do much better. Perhaps so. * * * nowhere in the record is there any indication that petitioner sought to examine police reports pertaining to himself, * * *."];

Cf. United States v. Gernie (2d Cir. 1958) 252 F.2d 664, cert. denied 356 U.S. 968, 78 S.Ct..1006, 2 L.Ed.2d 1073 (1958), rehearing denied, 2 Cir., 287 F. 2d 637 (1961) (Jacob W. Friedman, the attorney of record in the case at bar, was the attorney for the defendants-appellants) [Chief Judge Lumbard said (252 F.2d at 668): "A study of the record reveals that the defense had the means of securing information as to Berner's whereabouts and it chose not to secure the information"];

Cf. Green v. United States (1st Cir. 1958) 256 F.2d 483, 484, cert. denied 358 U.S. 854, 79 S.Ct. 83, 3 L.Ed.2d 87 (1958) ["It will not do to say that the matter could not have been disclosed at the criminal trial without the personal testimony of Green who, as the criminal defendant, was privileged not to testify. No doubt he was so privileged, as we may acknowledge without being obliged at the same time to affirm that his action in invoking the privilege had in it any elements of nobility. But Green cannot have it both ways. He cannot withhold the evidence, gambling on an acquittal without it, and then later, after the gamble fails, present such withheld evidence in a subsequent proceeding under 28 U.S.C. § 2255."];

Cf. United States ex rel. Reid v. Richmond (2d Cir. 1961) 295 F.2d 83 [per Lumbard, Ch. J.: "Every defendant must, of course, be accorded a fair trial. But the state is also entitled to a fair trial. When, after an extended hearing, informed and experienced defense counsel has taken a position, and the state, in reliance on it, has tried its case accordingly, it would be unduly tipping the scales of justice against the state to permit a defendant to argue that his conviction must be vacated because his counsel should not have taken the position he did and should not have made the concessions on which the state acted. * * Whatever may have been the reasons for the course taken by Reid and his counsel, it was a conscious reasoned choice made by counsel who was experienced in the ways of the criminal law. * * * The trial strategy had much to commend it; that it failed does not mean that it was mistaken. In any event, the failure does not entitle Reid to a second chance. Regrettable as hindsight may prove the choice to have been, Reid must be bound by what his lawyers did * * *."];

Palakiko v. Harper (9th Cir. 1953) 209 F.2d 75, 95, cert. denied 347 U.S. 956, 74 S.Ct. 683, 98 L.Ed. 1101 (1954) [Court rejected defense claim that the prosecution at the trial had concealed from the defendants the negative results of a certain FBI laboratory report. "* * * the fact that an analysis had been undertaken was disclosed by the prosecution at the trial. There is nothing to show that counsel for the defendants * * * sought or were denied any opportunity to inspect the report."];

United States ex rel. Kling v. La Vallee (N.D.N.Y.1960) 188 F.Supp. 470, 473 [the Court rejected the defense claim that the district attorney had suppressed the evidence of an eyewitness, a mailman. The trial testimony had disclosed the presence of that eyewitness at the scene of the robbery. "It is clear that notice was given to the defense and they

## XIII.

Defining the "primary duty of a lawyer engaged in public prosecution," the Canons of Professional Ethics, Canon 5, Judiciary Law N.Y.Appendix, pertinently provides:

"The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible."

It has been said that "the special problems pertaining to the ethical standards for prosecutors is in itself a major undertaking." Thode, The Ethical Standard for the Advocate, 39 Texas L. Rev. 575, 579 (1961). One may debate how to accommodate the competing social values of the prosecutor's dual role as a partisan advocate and as an impartial judicial officer. Cf. J. Edward Lumbard, The Lawyers' Responsibility For Due Process And Law Enforcement, 12 Syracuse L. Rev. 431 (1961).

However, the Supreme Court and the Court of Appeals for this circuit have, in effect, applied the rationale of Canon 5 in defining the standards of conduct that the United States Attorney must observe in a criminal case.

In Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the Court said:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor —indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." (295 U.S. at 88, 55 S.Ct. at 633.)

In Berger, the Court pointed out:

"During the trial, the United States Attorney who prosecuted the case for the government was guilty of misconduct, both in connection with his cross-examination of wit-

had all the power of court process to call this mailman if they so desired."];

Cf. Taylor v. United States (8th Cir. 1956) 229 F.2d 826, 833–834, cert. denied, 351 U.S. 986, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956);

Cf. Scales v. United States (1961) 367 U.S. 203, 258, 81 S.Ct. 1469, 1501, 6 L.Ed.2d 782 [whether the statements turned over to a defendant pursuant to Title 18 U.S.C. § 3500 "may be useful for purposes of impeachment is a decision which rests, of course, with the defendant himself."];

Delbridge v. United States (1958) 104 U.S.App.D.C. 399, 262 F.2d 710 [the fact of newspaper publication of a precise amount of money reportedly stolen in a robbery was a vital and disputed issue. The prosecution told the jury that there had been no such newspaper story. The defendant was convicted in a one-day trial. Six days later, a motion for a new

trial was made when the defendant's lawyer discovered at the Library of Congress two local newspapers carrying the article as had been claimed by the defendant. The court granted a new trial because (at 712) "it is too much to require that under the circumstances counsel should have anticipated the key part to be played by the newspaper incident in the prosecutor's attack on Delbridge and thus should have searched the files in the Library of Congress upon such anticipation. The publication of the article was not an obvious or readily available fact, a technicality, or a point of law."].

It is ancient jurisprudence that a new trial will not be granted to enable the defeated party to offer "witnesses of whose existence he had known and who were available" at the time of the trial. V. The Talmud (London, Soncino ed., 1935) Sanhedrin I, chap. III, 195–196; Cohen, Everyman's Talmud (1949) 312.

nesses and in his argument to the jury, the particulars of which we consider at a later point in this opinion." (295 U.S. at 80, 55 S.Ct. at 630.)

In United States v. Zborowski (2d Cir., 1959) 271 F.2d 661—where the prosecutor failed to call the trial judge's attention to portions of the prosecution witness' grand jury testimony that contained inconsistencies with the witness' trial testimony, and the trial judge therefore did not read the grand jury minutes, despite a request by defense counsel that he read the minutes—the Court of Appeals said (at 668):

> "The prosecutor must be vigilant to see to it that full disclosure is made at trial of whatever may be in his possession which bears in any material degree on the charge for which a defendant is tried. In the long run it is more important that the government disclose the truth so that justice may be done than that some advantage might accrue to the prosecution toward ensuring a conviction. Berger v. United States, 1935, 295 U.S. 78, 88 [55 S.Ct. 629]."

In United States v. Consolidated Laundries Corporation (2d Cir., 1961) 291 F.2d 563—where the prosecutor negligently suppressed helpful defense evidence in violation of the court's order to turn over documents containing such evidence and the existence of such documents was discovered by the defense after the trial—the Court of Appeals (at 571) quoted the above statement from the Zborowski case.

The Court of Appeals in Zborowski and in Consolidated Laundries said that it was discharging its "duty as an appellate court to supervise" "the correct administration of criminal justice in the federal courts" (291 F.2d at 571) by enforcing "standards of fair play in federal criminal proceedings" (271 F.2d at 668).

What the Court of Appeals said in Zborowski and what it reiterated in Consolidated Laundries with respect to the prosecutor's duty of "full disclosure" cannot be fully appreciated unless the language is read in its factual context. This is not to suggest that what the Court of Appeals said in Zborowski and Consolidated Laundries should be read meticulously as technical language or construed narrowly as confined to the particular facts in those two cases that framed the issue therein for decision. On the contrary, the high purpose of ensuring fundamental fairness in federal criminal justice illumines every phrase and requires trial courts to recognize the language as formulating a directing principle and basic guide. Nevertheless, what was said is a compass, not a detailed map.

The issue in the present case is not one of principle or policy but of the application of recognized principle and policy to the particular circumstances disclosed by this record.

## SPECIFIC CONCLUSIONS OF LAW

 Applying the foregoing rules to the record herein, the Court reaches the following specific conclusions:

1. The Government did not withhold, suppress or conceal any facts, testimony or documentary evidence which the defendant was entitled to receive or have disclosed to him.

2. The Government's conduct comported with all controlling constitutional and other standards and criteria of fairness, propriety, ethics, and due process.

3. There was no wilful, negligent, inadvertent or other violation of any rights of the defendant committed by the Government by any act of commission or omission.

4. The defendant has failed to establish any basis for a new trial. A new trial is not required in the interest of justice. A new trial is not required on the asserted ground of newly discovered evidence.

5. In deciding this motion, the Court has exercised its discretion and judg-

ment in light of the legal principles hereinabove considered and in accordance with the total factual record, including the knowledge gained from presiding at the trial.

6. The defendant's motion for a new trial is hereby denied in all respects. So ordered. This order shall be effective immediately.

### APPENDIX

Motion under Rule 15, F.R.Crim.Proc. to take the deposition of a witness (Dr. Hans Hirschfeld) now in Germany, for use upon the hearing of this motion for a new trial. Denied.

The Court will proceed to decide the application made by Mr. London [defendant's attorney] to take the deposition of Dr. Hans Hirschfeld.

The motion was made orally on the record as appears in the transcript of the proceedings on the motion for a new trial (pages 40 to 44).

No question is raised by the Government as to the form of the motion. The Court will accept the application as having been made with the same force and effect as if a formal set of motion papers had been submitted.

The motion is made by the defendant pursuant to Rule 15 of the Federal Rules of Criminal Procedure.

Both sides recognize that an order permitting depositions to be taken in a criminal case rests within the sound discretion of the Court, a discretion which must be exercised in accordance with established standards and criteria.

There are numerous cases in this area of the law. In some, the motion to take a deposition under Rule 15 was granted. United States v. Cameron, 15 F. 794 (E.D.Mo.1883); Young Bark Yau v. United States, 33 F.2d 236 (9 Cir., 1929); United States v. Hofmann, 24 F.Supp. 847 (S.D.N.Y.) 1938; Bistram v. United States, 248 F.2d 343 (8 Cir., 1957).

In other cases, the motion to take a deposition was denied. Tom Ung Chai v. Burnett, 25 F.2d 574 (9 Cir., 1928); United States v. Dockery, 50 F.Supp. 410 (E.D.N.Y.1943); United States v. Ausmeier, 5 F.R.D. 395 (E.D.N.Y.1946); United States v. Glessing, 11 F.R.D. 501 (D.Minn.1951); Heflin v. United States, 223 F.2d 371 (5 Cir., 1955); United States v. Broker, 246 F.2d 328 (2 Cir., 1957); United States v. Grado, 154 F. Supp. 878 (W.D.Mo.1957); United States v. Bentvena, 60 Crim. 436 (S.D. N.Y.1960).

The Government and defense counsel have submitted memoranda of law in which the leading cases in this area of the law have been briefed and analyzed. The Court has given close attention to the briefs, has read all the cases cited by counsel, and has conducted independent research into the issues raised by the motion at bar.

In our jurisprudence, the theological sanctity of a witness's oath or the ethical obligation of his affirmation is reinforced by the legal sanction of the law of perjury. To stipulate in advance that a witness whose testimony is sought will be given immunity against arrest here for his possible perjury would stultify the administration of justice. By destroying the legal significance of the witness's oath or affirmation, such a stipulation would make the witness a law unto himself, with only such conscience as he may possess as his guide.

This Court is being asked to authorize the deposition of a witness abroad because the witness, who is otherwise able and willing to testify, declines to come to the United States solely for the asserted reason that he desires an assurance of immunity against arrest here should the duly constituted authorities conclude that his testimony is perjurious. (Transcript of Hearings on Motion for New Trial, pages 296–306, 345–355, 356–359; Court's Exhibit IV.)

Defendant's "Memorandum of Law with respect to the application for an order directing that the testimony of Dr. Hans Emil Hirschfeld be taken by deposition", page 1, declares: "Dr. Hirschfeld is unwilling to come to the United

States unless he receives assurances that the Department of Justice is unwilling to give."

For reasons already indicated, to enter into such a bargain with a prospective witness would be a travesty of justice.

Rule 15(a) of the Federal Rules of Criminal Procedure explicitly declares, among other things, that the Court may order that a prospective witness's testimony be taken if it appears that he "may be unable to attend or prevented from attending * * * and that it is necessary to take his deposition in order to prevent a failure of justice."

It has been represented to the Court that Hirschfeld is anxious to attend before this Court and that he would be able to come here. There is no aspect of physical or economic disability or inability. There is no claim of financial hardship on the witness or the defendant.

Thus, it does not appear that Hirshfeld is unable to attend or that he is prevented from attending. Nor can it be argued reasonably that acceptance of the terms and conditions proposed on behalf of Hirschfeld is necessary "in order to prevent a failure of justice."

On the contrary, to accept such proposed terms and conditions would promote rather than prevent a failure of justice.

Since it clearly appears that some of the essential conditions prescribed by Rule 15 do not exist, the defendant has not established the minimal prerequisites for obtaining leave to take the proposed deposition.

Neither the Court nor counsel have found any decision in which a court ordered the taking of a witness's deposition under circumstances resembling the particular facts of the present case.

Aside from the circumstances already specifically alluded to by the Court, the total record demonstrates that the defendant's application to take Hirschfeld's deposition is devoid of merit. Measured by established standards and criteria of judicial discretion, the evidence submitted in behalf of the defendant does not warrant the exercise of the Court's discretion in favor of the defendant's application.

The other testimonial aspects of Hirschfeld in the context of the total record will be discussed by the Court in its opinion upon the decision of the motion for a new trial.

A close and careful analysis of the entire record requires the Court to deny the defendant's motion to take Hirschfeld's deposition.

So ordered.