**UNITED STATES of America, Appellee,**

v.

**Peter LESLIE and Roland Williams, Appellants.**

No. 3652, Dockets 95–1679, 96–1022.

United States Court of Appeals, Second Circuit.

Argued Sept. 6, 1996.

Decided Jan. 8, 1997.

Charles Lavine, Forest Hills, NY, for Appellant Peter Leslie.

Michael Hurwitz, Hurwitz, Stampur & Roth, New York City, for Appellant Roland Williams.

Maria L. Zanfini, Assistant United States Attorney, Southern District of New York, New York City, for Appellee.

Before: FEINBERG, CARDAMONE, and McLAUGHLIN, Circuit Judges.

## BACKGROUND

McLAUGHLIN, Circuit Judge:

Peter Leslie and Roland Williams were tried together in the Southern District of New York. (Duffy, Kevin T. *Judge*). The jury convicted Leslie of one count of conspiracy to launder drug money in violation of 18 U.S.C. § 1956(h), one count of laundering $750,000 of drug money in violation of 18 U.S.C. § 1956(a)(3)(B), and one count of laundering $20,000 of drug money in violation of 18 U.S.C. § 1956(a)(3)(B). The jury deadlocked as to Williams. Upon retrial, a second jury convicted Williams of one count of conspiracy to launder drug money in violation of 18 U.S.C. § 1956(h), and one count of laundering $750,000 of drug money in violation of 18 U.S.C. § 1956(a)(3)(B). Judge Duffy sentenced both to 86 months' imprisonment. They appeal.

### A. *The Money Laundering Scheme*

At the first trial, the government established that Leslie and Williams conspired to launder drug money, and then laundered the drug money through Williams's real estate business. Undercover FBI agents, working with a confidential informant ("CI"), spoke with Leslie in numerous recorded conversations. In these conversations Leslie, the CI and the agents discussed the inner workings of several illegal financial transactions.

On October 19, 1993, Leslie met with the CI and undercover FBI Agent Maniquis to discuss laundering drug money through a real estate business owned by Leslie's business associates.

The three met again in November for further discussion. The agent arranged to give Leslie a significant amount of supposed drug money and to take back checks drawn on the real estate business's bank accounts. In May, 1994, Leslie told the agent that his "real estate guys" were worried that the deal might be a setup. To insulate his associates, Leslie drew up a "loan agreement"—a document the real estate business could use to mask the transaction as a legitimate business deal in case of an audit—and gave it to the undercover agent for his signature.

After further discussion, Leslie told the agents that his real estate associates were still uneasy. He devised a small "test" transaction, to calm their jitters: Leslie accepted $20,000 in drug cash in exchange for checks drawn on the bank account of his corporation, Fort Securities Funding, at the First Bank of the Americas.

In July, Leslie informed the agents that his real estate associates were mollified and were now ready to go through with the larger, $750,000 deal. He told the agents that

his partner in the venture was Roland Williams, and that Williams's company would furnish the checks for the laundering scheme. Leslie gave the agents a copy of another "loan agreement," this one bearing Williams's signature. Attached to the loan agreement were photocopies of checks signed by Williams from the account of his business, Realty Dealers, Inc., at the Carver Federal Savings Bank in Roosevelt, Long Island.

Leslie, Williams, and the agents met on a Manhattan street to make the cash-for-checks exchange. One agent said to Williams that the situation had to be "cool," and that "its like powder type money, so you can't be like bringing this over the border." While Leslie and Williams sat in their parked car, agents drove up in a separate car with the drug cash in a brown paper bag in the trunk. Williams and Leslie got out to inspect the money, and, again, Maniquis warned Williams that "there's a lot of powder in there from coke and everything, so you can't be bringing it over the border." When Williams reached for the bag of money in the trunk, the agents arrested both Leslie and Williams.

After his arrest, Williams explained to the agents that he thought the deal was legitimate. He claimed to be trying to get financing to buy some property and that Leslie had told him about a source of money from whom he could borrow cash. Although he admitted that Leslie's proposal sounded "shaky," he claimed he went to a DEA office in Garden City, and spoke to two agents by the names of Accaro and Melendez, and asked them to check on the people involved in the transaction. He further claimed that the DEA advised him that there was no information on these persons. At trial, the government called a DEA agent from Melville, New York who testified that, not only were there no DEA agents named Accaro or Melendez, there was not even a DEA office in Garden City.

### B. *Leslie's Attorney Problems*

Before trial, Leslie was represented by Bertram Brown. At a pre-trial conference in March, 1995, Leslie asked the court to relieve Brown and assign Frederick Hayes as his attorney. Understandably, Judge Duffy did not want to postpone the April 3rd date for the beginning of trial. Mr. Hayes informed Judge Duffy that he was willing to go forward despite the time crunch.

During the conference, Brown advised Judge Duffy that Hayes might have a conflict of interest: Hayes had once represented Williams in an unrelated criminal investigation a year before. (Hayes had counselled Williams during an FBI investigation of Williams's attempt to purchase the Freedom National Bank in New York.) Williams's attorney explained to Judge Duffy that Williams was prepared to waive any conflict that might arise if Hayes were to represent Leslie. While both Hayes and Leslie were present during this colloquy, neither said anything about a conflict of interest. The court did not conduct a hearing to determine if Leslie waived any conflict. Williams never testified at trial, and there was no mention of the Freedom National Bank.

At trial, Hayes complained that, despite his earlier representation that he was ready to try the case, he did not have enough time to review some discovery materials. In addition, in attempting to establish an entrapment defense for Leslie, Hayes asked an FBI agent on cross-examination whether Leslie had ever been investigated for money laundering in the past. The strategy backfired when the agent said yes. Hayes also failed to object or move for a severance when an agent testified to Williams's post-arrest statement implicating Leslie.

### C. *The Jury Verdicts*

The jury convicted Leslie but deadlocked on Williams. After trial, Leslie asked the court to replace Hayes as his counsel. Judge Duffy appointed Charles Lavine, who moved for a new trial based on both Hayes's ineffective assistance, and Hayes's conflict of interest arising from his prior representation of Williams.

Judge Duffy denied the new trial, reasoning that Williams's waiver of any conflict at the pre-trial hearing constituted a waiver of the attorney-client privilege between Hayes and Williams, and with the privilege thus

eliminated, Hayes no longer had a conflict because he would have been free to cross-examine Williams· on anything relevant. Judge Duffy also ruled that Hayes's representation was not ineffective.

### D. *Williams's Retrial*

On retrial, the government produced the same evidence, and Williams raised the same defenses. Williams called two witnesses: John Billeris, his real estate broker, and Richard Longworth, his real estate attorney. In an effort to prove that Williams thought the transaction was legitimate, both testified that Williams had been trying to get loans to purchase a piece of property.

During the government's cross-examination, however, Judge Duffy interjected and asked Billeris, the broker, if he had ever seen a closing occur in a car in the middle of the street. Billeris said he had not. Judge Duffy asked Longworth, the lawyer, if he had ever been to a closing in a car in the street. Longworth answered no, but that it was possible. Then Judge Duffy asked him if he had ever seen a closing in which $750,000 in a brown paper bag was part of the transaction. Longworth said no.

At the close of the evidence, Williams moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal because of the government's failure to prove the interstate commerce element of the money laundering statute. Judge Duffy permitted the government to reopen its case to call a witness from the Carver Federal Savings Bank to testify that Carver participated in interstate transactions and that its accounts were insured by the federal government.

### DISCUSSION

A. *Leslie's Claim of Ineffective Assistance of Counsel*

#### 1. *Conflict of Interest*

Leslie argues that his trial attorney, Hayes, had a conflict of interest because of his prior representation of Williams. He argues that the court's failure to conduct a *Curcio* hearing, *United States v. Curcio,* 680 F.2d 881 (2d Cir.1982), to obtain a waiver of

the conflict violated his Sixth Amendment right to counsel.

■ Under the Sixth Amendment, counsel is deemed ineffective if he had either: "(1) a potential conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance." *United States v. Levy,* 25 F.3d 146, 152 (2d Cir.1994). There is an actual conflict when the attorney's and the defendant's interests diverge on a material fact or a legal issue, *Winkler v. Keane,* 7 F.3d 304, 307 (2d ·Cir.1993), or when the attorney's current representation is impaired by the loyalty he owes a former client, *United States v. Malpiedi,* 62 F.3d 465, 469 (2d Cir.1995).

■ When the court learns of a possible conflict, it must explore the problem. *Levy,* 25 F.3d at 153. If that inquiry reveals an actual or potential conflict, the court has a "disqualification/waiver" obligation. *Id.* If the conflict turns out to be actual and severe, the district court must disqualify the attorney. *Id.* If the court discovers a lesser or potential conflict, it must proceed to a *Curcio* hearing to obtain an informed waiver of the conflict from the defendant. *Id.* To prove that a potential conflict violated his Sixth Amendment rights, a defendant must demonstrate prejudice. *Winkler,* 7 F.3d at 307.

■ When Judge Duffy learned of the potential conflict problem, he reacted immediately and satisfied his inquiry obligation, concluding that there was, in truth, no potential conflict. He received assurances from Williams's counsel that Williams waived any attorney-client privilege that might otherwise have hindered Hayes's cross-examination of Williams, if Williams should take the stand. Judge Duffy correctly concluded that Williams's waiver obviated the need for a *Curcio* hearing.

■ Even if Hayes labored under a conflict of interest, Leslie's claim still fails. Even if we assume there was a conflict, it certainly was not actual or severe, and could only be regarded as potential: Leslie and Hayes did not divide on any material issue of fact or law, and Hayes's performance was not impaired by whatever loyalty he owed to

Williams. As, at best, only a potential conflict existed, Leslie's claim fails because he has shown no prejudice. Indeed, Williams never took the stand, and the government never adverted to the matters involved in Hayes's prior representation of Williams.

### 2. *Otherwise Effective*

Leslie finds Hayes's performance wanting in several respects and argues that he did not receive effective assistance of counsel because Hayes: (1) was not familiar with all of the recorded conversations; (2) blundered by developing testimony from FBI agents on cross-examination that undermined Leslie's entrapment defense; and (3) failed to object to Williams's postarrest statements implicating Leslie.

It is now black-letter law that to show ineffective assistance of counsel, a defendant must establish that his counsel's performance fell below an objective standard of reasonableness and that this prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984). To show prejudice, the defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. There is a presumption that counsel's assistance fell within a wide range of reasonable professional assistance. *Id.* at 689, 104 S.Ct. at 2065.

It is somewhat disingenuous for Leslie to claim now that his attorney did not have enough time to prepare, and was therefore ineffective, when Leslie himself created the time pressure. Leslie knew that Judge Duffy was not going to change the trial date, yet he still demanded to change counsel.

In any event, Hayes's performance illustrated that he was prepared for trial. He thoroughly cross-examined the agents about the recorded conversations. As a strategic matter, Hayes tried to erect an entrapment defense, and he managed to elicit testimony that Leslie had no prior criminal record. Admittedly, the strategy backfired when agents testified that Leslie had been the subject of prior investigations. But, hindsight is always twenty-twenty: Hayes was pursuing a strategy that at the time seemed to be a viable defense for Leslie in light of the overwhelming evidence against him.

 Leslie also claims that Hayes's failure to object to testimony regarding Williams's post-arrest statement implicating Leslie constituted ineffective assistance. Leslie cannot show a reasonable probability that, but for Hayes's failure to object, the result of the proceeding would have been different. There was solid evidence of Leslie's guilt, including 16 recorded conversations with agents regarding laundering drug money. Williams's post-arrest statement added little, if anything, to the persuasive force of the government's case.

### B. *Interstate Commerce Element of the Money Laundering Statute*

Both defendants argue that, although the language of the money-laundering statute requires only a *de minimis* connection to interstate commerce, the Supreme Court decision in *United States v. Lopez,* — U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), ratcheted up the standard in every federal criminal statute to require that the prohibited conduct have a "substantial" connection to interstate commerce. They maintain that the government failed to prove a substantial effect on interstate commerce, measured by this heightened standard.

### 1. *The Defendants' Lopez Challenge*

 We do not see in the *Lopez* holding the broad sweep that defendants perceive.

In *Lopez* the Supreme Court reviewed the constitutionality of the Gun–Free School Zones Act, which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A) (1988 Supp.). The Court determined that the Act exceeded Congress's commerce clause authority because possession of a gun near a school was not an activity which "substantially affects" interstate commerce. *Lopez,* — U.S. at —— ——, 115 S.Ct. at 1631–32.

The money laundering statute provides that

(3) Whoever, with the intent—

(B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity . . .

conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity . . . shall be fined . . . or imprisoned.

18 U.S.C. § 1956(a)(3)(B). The term "financial transaction" is defined as

(A) a transaction which *in any way or degree* affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.

18 U.S.C. § 1956(c)(4) (emphasis added).

Certainly, before *Lopez* the courts interpreted the "in any way or degree" language of the money laundering statute to require only evidence that the individual transaction at issue had a *de minimis* effect on interstate commerce. *See, e.g., United States v. Peay*, 972 F.2d 71, 74 (4th Cir.1992). Since *Lopez*, courts interpreting the Hobbs Act (from which the money laundering statute derived its language) have continued to hold that *Lopez* did not affect this *de minimis* standard. These courts reasoned that the Hobbs Act regulates activities which, in the aggregate, have a substantial effect on interstate commerce; hence, the "*de minimis* character of individual instances arising under [the] statute is of no consequence." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1629; *see, e.g., United States v. Bolton*, 68 F.3d 396, 398–99 (10th Cir.1995) (Hobbs Act), *cert. denied*, —— U.S. ——, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996); *United States v. Atcheson*, 94 F.3d 1237, 1241–43 (9th Cir.1996) (Hobbs Act); *see also United States v. Grey*, 56 F.3d 1219, 1224–25 (10th Cir.1995) (recognizing, after *Lopez, de minimis* standard survives in the money laundering statute). Money laundering is the archetypal activity which, while in isolation may not affect interstate commerce, undoubtedly will have ramifications in interstate commerce when taken in the aggregate. The single money launderer resembles Mr. Filburn, the farmer, whose individual demand for wheat, while inconsequential, was "not enough to remove him from the scope of federal regulation where . . . his contribution, taken together with that of many others similarly situated, is far from trivial." *Wickard v. Filburn*, 317 U.S. 111, 127–28, 63 S.Ct. 82, 90, 87 L.Ed. 122 (1942).

We conclude, therefore, that *Lopez* did not elevate the government's burden under the money laundering statute. The government need only prove that the individual subject transaction has, at least, a *de minimis* effect on interstate commerce.

*2. Leslie's Convictions and Proof of Interstate Commerce*

Leslie argues that the government failed to prove that the two money laundering schemes, the "test transaction" for $20,000 and the principal one for $750,000, had sufficient ties to interstate commerce.

We review sufficiency of evidence determinations de novo. *United States v. Sirois*, 87 F.3d 34, 38 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 328, 136 L.Ed.2d 241 (1996). A defendant challenging the sufficiency of evidence must persuade us that, "viewing the evidence in the light most favorable to the government, . . . no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Taylor*, 92 F.3d 1313, 1333 (2d Cir.1996) (internal quotation marks and citation omitted); *United States v. Brewer*, 36 F.3d 266, 268 (2d Cir. 1994). "This standard of deference is especially important when reviewing a conviction of conspiracy." *Taylor*, 92 F.3d at 1333 (citing *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir.1992)).

It should be noted that Leslie, unlike Williams, raised his challenge to the sufficiency of the evidence in a Rule 33 motion for a new trial, not in a motion for a judgment of acquittal under Rule 29. The government argues that Leslie's failure to raise the suffi-

ciency question in a Rule 29 motion amounts to a waiver of this issue, absent plain error. This argument misses the mark. We review sufficiency challenges raised in a new trial motion in the same fashion as those brought in motions for a judgment of acquittal. *See United States v. Almonte,* 952 F.2d 20, 23 (1st Cir.1991).

■ To obtain a conviction under the money laundering statute, the government must prove: (1) that the scheme was a transaction under 18 U.S.C. § 1956(c)(3), which "includes a ... pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, ... by whatever means effected;" and (2) either, under 18 U.S.C. § 1956(c)(4)(A), that the transaction affected interstate commerce, or, under 18 U.S.C. § 1956(c)(4)(B), that the transaction involved a financial institution which engages in or affects interstate commerce.

The interstate commerce element of the money laundering statute, while an essential element, is jurisdictional in nature. The requirement that the transaction or financial institution "affect[ ] interstate commerce" means that proof of a "minimal effect" on interstate commerce is needed to support federal jurisdiction. *See Grey,* 56 F.3d at 1225 (quoting *United States v. Kelley,* 929 F.2d 582, 586 (10th Cir.1991)). The statute's requirement that the questioned activity "affect commerce" in "any way or degree" signals Congress's desire to exercise the full extent of its Commerce Clause power. *Peay,* 972 F.2d at 74; *see Russell v. United States,* 471 U.S. 858, 859, 105 S.Ct. 2455, 2456, 85 L.Ed.2d 829 (1985); *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960) (interpreting Hobbs Act from which money laundering statute derived its language). Hence, the government's burden is not heavy.

The government maintains that it satisfied the interstate commerce element at Leslie's trial by proving that: (1) the undercover agent told Leslie, albeit falsely, that Colombians and drugs were involved in the money laundering operation; (2) the checks were drawn on banks; and (3) Williams was going

to use the proceeds to buy some land in New York.

■ The government argues that it is sufficient to prove that the defendant *believed* that there was an interstate nexus in his crime, and, thus, it is not essential that there be in fact an interstate nexus. This is a correct statement of the law—but only as to the conspiracy count, *see United States v. Pinckney,* 85 F.3d 4, 7–8 (2d Cir.1996). As to the substantive count, it *is* essential to prove an actual nexus to interstate commerce. *See United States v. Rosa,* 17 F.3d 1531, 1544 (2d Cir.1994).

### a. The $750,000 Transaction

■ Given the evidence surrounding the principal $750,000 transaction, we cannot say that no rational juror could find the interstate commerce nexus beyond a reasonable doubt. Judge Duffy instructed the jury that the government had to prove that the defendants engaged in a "financial transaction" which, he explained, "is a transaction which in any way or degree affects interstate or foreign commerce ... [or a] transaction involving the use of a financial institution which is engaged in or the activities of which affect interstate commerce." A jury, examining all of this evidence, and drawing reasonable inferences therefrom, could fairly and logically conclude that the cash-for-checks exchange was a transaction using a financial institution, the activities of which affected interstate commerce, *see* 18 U.S.C. § 1956(c)(4)(B), or a transaction affecting interstate commerce, *see* 18 U.S.C. § 1956(c)(4)(A).

### i. The Exchange Was a "transaction"

Williams wrote a check which committed the funds of a real estate business, placing that entire operation at risk, in exchange for what he believed to be drug proceeds. When the defendants surrendered the check to the federal agents in exchange for cash, they engaged in a "transaction" within the meaning of the money-laundering statute.

Congress intended the term "transaction" to be interpreted broadly, *see* S.Rep. No. 99–433, at 12–13 (1986), and we conclude that, in this situation, where the government agents

got the check, and the defendant had the cash, there was a transaction for the purposes of the statute. *See* 18 U.S.C. § 1956(c)(3) (the "term transaction includes a ... pledge, ... transfer, ... or other disposition ..."). The fact that the check was not deposited or cleared is inconsequential. *Cf. United States v. Li*, 55 F.3d 325, 330 (7th Cir.1995) (initiating a transaction is enough to satisfy transaction requirement of money laundering statute). Indeed, it would be bizarre to require the federal agents, working undercover, to take the check to a bank before the exchange would qualify as a transaction.

### ii. The Exchange Was a "financial transaction"

The government also proved that the transaction involved a financial institution whose activities affected interstate commerce in some degree. When the word "Federal" appears in a bank's name, the implication is that the bank is a financial frigate navigating channels of nationwide commerce. Indeed, "[f]ederally chartered savings institutions have the word 'Federal' or the initials 'FSB' or 'FA' in their names." Federal Deposit Insurance Corp., FIL–73–92, Fed. Banking L. Rep. at 89,198 (Oct. 19, 1992). Under federal law, a savings institution cannot use the term "Federal" in its name except as allowed under applicable statutes. *See* 18 U.S.C. § 709. That the drawee bank involved in this case was called a "Federal" savings institution supports a jury's conclusion that the transaction involved the use of a financial institution which has, at least, a *de minimis* effect on interstate commerce. *See* 18 U.S.C. § 1956(c)(4)(B).

The government also proved that the checks used to launder the drug money were drawn on the account of Williams's real estate business. The Supreme Court has held that an activity such as the rental of real property is one which "unquestionably" affects interstate commerce. *Russell v. United States*, 471 U.S. 858, 862, 105 S.Ct. 2455, 2457, 85 L.Ed.2d 829 (1985) (rental property is property "used ... in an activity affecting interstate ... commerce ..." under the arson statute, 18 U.S.C. § 844(i)). Surely, if renting real estate is an activity which unquestionably affects interstate commerce, one need not make a leap of faith to conclude that a business engaged in real estate markets also has, at least, a minimal effect on interstate commerce.

We conclude that the government established both that the cash-for-checks exchange was: (1) a transaction affecting interstate commerce under 18 U.S.C. § 1956(c)(4)(A), and (2) a transaction involving a financial institution the activities of which have an effect on interstate commerce under 18 U.S.C. § 1956(c)(4)(B).

### b. The $20,000 Transaction

■ We cannot say, however, that a reasonable juror could conclude that the government proved beyond a reasonable doubt the interstate commerce element with regard to the $20,000 test transaction. *See Pinckney*, 85 F.3d at 8 (interstate commerce a substantive element of federal crime to be proven beyond a reasonable doubt). Unlike the larger transaction, there was no indication that the financial institution used, First Bank of the Americas, had any involvement in interstate commerce. Hence, the government has failed to show that the transaction was one which involved a financial institution engaged in, or the activities of which affected, interstate commerce under 18 U.S.C. § 1956(c)(4)(B). To conclude that the transaction affected interstate commerce under 18 U.S.C. § 1956(c)(4)(A) simply because *a bank* was involved in the transaction would, in effect, read § 1956(c)(4)(B) out of the statute. Finally, there was no indication that the business used as the conduit for the cash was engaged in interstate commerce.

In short, the government did not provide even the slenderest of threads upon which to hang the jurisdictional element of the money-laundering statute. We therefore reverse Leslie's conviction as to the $20,000 test transaction, and remand the case to the district court to dismiss the indictment as to that count.

Yet again, we find ourselves compelled to remind prosecutors of their obligation to prove *every* element of a criminal charge. A decade ago we found it

well-nigh incredible that after [repeated warnings from this and other Circuits] the Department of Justice or ... a large United States Attorney's office such as that for the Southern District of New York, still has not effectively instructed prosecutors to ask the simple question that would avoid the need for judicial consideration of what should be a non-problem, not to mention the risk of reversal of convictions obtained after great effort by the Government, considerable expense to the public and long service by jurors.

*United States v. Sliker,* 751 F.2d 477, 484 (2d Cir.1984) (warning prosecutors of failure to prove FDIC insured status in prosecution for embezzlement, bank larceny, and falsification of bank records). We verge on becoming "mad-eyed from stating the obvious," R.P. Wilbur, *Advice to a Prophet,* 196: federal prosecutors must devote the minimal effort necessary to establish federal jurisdiction over the acts of the accused. There is nothing more crucial, yet so strikingly obvious, as the need to prove the jurisdictional element of a crime. Sadly, we are forced to continue reversing convictions, as long as prosecutors remain lax in the simpler aspects of their jobs.

### 3. *Williams's Conviction and Proof of Interstate Commerce*

■ At Williams's second trial—as an afterthought and only after Williams's Rule 29 motion—the government proved that Carver Federal Savings's deposits are insured by the Federal Deposit Insurance Corporation ("FDIC"), and that the bank handled the accounts of out-of-state depositors. Proof that a savings institution's accounts are federally insured is certainly sufficient to prove that the transaction involved a financial institution the activities of which affect interstate commerce under 18 U.S.C. § 1956(c)(4)(B). *Peay,* 972 F.2d at 74. Hence, there was sufficient evidence of a nexus to interstate commerce to support Williams's conviction both at the first trial (see section B.2.a.ii.) and the second trial.

### C. *Williams's Double Jeopardy Clause Claim*

■ Williams argues that his first trial ended in a hung jury because there was insufficient evidence, and this bars his second trial under the Double Jeopardy Clause. He relies on the Supreme Court's decision in *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). In *Burks,* the defendant was tried, found guilty, and his motion for a new trial denied. An appellate court reversed the conviction, expressly finding insufficient evidence to support Burks's conviction, but remanded the case to the district court to determine if " 'a directed verdict of acquittal should be entered or a new trial ordered.' " *Burks,* 437 U.S. at 4, 98 S.Ct. at 2144. The Supreme Court rejected this disposition, holding that once the appellate court determined that there was insufficient evidence to support Burks's conviction, a subsequent trial was barred by the Double Jeopardy Clause. Here, however, we never held that the first verdict was legally insufficient, nor could we have. There was no appeal—indeed, there was no verdict.

In *Richardson v. United States,* 468 U.S. 317, 326, 104 S.Ct. 3081, 3086–87, 82 L.Ed.2d 242 (1984), the Supreme Court specifically declined to extend the *Burks* rule to Williams's situation. The court explained that where "there has only been a mistrial resulting from a hung jury," and no judicial finding of insufficiency, retrial is not barred by the Double Jeopardy Clause. *Richardson,* 468 U.S. at 323, 104 S.Ct. at 3085.

### D. *Sufficiency of Evidence Against Williams*

■ Williams argues that there was insufficient evidence to prove that he believed that the money was the proceeds of specified unlawful activity.

Under the money laundering statute, the government must prove that the funds were "represented to be the proceeds of some form of unlawful activity," 18 U.S.C. § 1956(c)(1), and that the defendant believed that the money is proceeds of unlawful activity. 18 U.S.C. § 1956(a)(3)(B).

The agents told Williams that the money was "powder-type" money, that there were a lot of cocaine traces on the money, and that

the money should not be brought over the border because of the trace amounts of drugs on the money. This was a sufficient representation that the money was the proceeds of a drug transaction, and a jury could reasonably infer that the defendant believed that to be the case.

### E. Judge Duffy's Questioning of Williams's Defense Witnesses

Williams argues that Judge Duffy's questioning of two witnesses went beyond mere clarification, and crossed the line into advocacy.

 In determining whether a trial judge's conduct deprived a defendant of a fair trial, we must examine the entire record to determine if "jurors have been impressed with the trial judge's partiality to one side to the point that this became a factor in the[ir] determination." *United States v. Guglielmini*, 384 F.2d 602, 605 (2d Cir.1967). The district judge may actively participate and give his own impression, as long as he does not become an advocate for the government. *United States v. Filani*, 74 F.3d 378, 385 (2d Cir.1996). Where the court assumes the role of prosecutor and displays bias, reversal is required. *Id.* at 385. The judge should ask only those questions necessary to clarify ambiguities, correct misstatements, or obtain information necessary to make rulings. *Id.* at 386. If a judge's actions create an impression of partisanship, curative instructions will generally not save the day. *Id.*

 Williams's defense was that he naively believed the entire transaction was legitimate, and that he would use the funds to purchase some land. He called his lawyer and his real estate broker to support this defense. Judge Duffy asked both witnesses if they had ever heard of similar transactions. His questions amounted to nothing more than an expansion and clarification of the witnesses' testimony. Judge Duffy's questioning lay well within the permissible range of questioning permitted to a trial judge. A district court judge is not required to remain idle while testimony, matted with confusion, is presented to the jury. Judge Duffy was even-handed in his questioning throughout the course of the trial and at times brought out information favorable to Williams. We cannot say that, viewing the record as a whole, Judge . Duffy's questioning of Williams's witnesses was improper.

### F. Allowing Government To Reopen Its Case Against Williams

Williams argues that at the second trial, Judge Duffy erred, after Williams moved for acquittal, when he allowed the government to re-open its case to call a witness to testify that Carver Federal Savings Bank was federally insured and handled out-of-state customers.

 We note that, given our holding above that proof of (1) a bank with the word "federal" in its name and (2) the involvement of checks drawn on the account of Williams's real estate business satisfies the government's burden of showing an effect on interstate commerce, such reopening was not necessary to satisfy the jurisdictional prerequisite. In any event, even after a defendant moves under Federal Rule of Criminal Procedure 29 for acquittal, a district judge retains wide discretion to allow the government to re-open its case to correct errors "or some other compelling circumstance ... justifies a reopening and no substantial prejudice will occur." *United States v. Hinderman*, 625 F.2d 994, 996 (10th Cir.1980). Generally, a district court will allow reopening to establish venue, identify the defendant, or attend to other technical matters. *See, e.g., United States v. Washington*, 861 F.2d 350, 353 (2d Cir.1988) (police officer called after reopening to identify the defendant).

 While the interstate commerce element of a criminal statute is critical, it is, after all, only a jurisdictional prerequisite to the exercise of federal power. *See United States v. Wilson*, 523 F.2d 828, 829 n. 2 (8th Cir.1975) (interstate commerce element of statute predicate for federal court jurisdiction). In that sense, it is a simple matter, like venue or the identification of the defendant, and a district court may allow the government to reopen its case to establish this jurisdictional predicate. Because the government presented the evidence without

delay after initially resting, and prejudice was unlikely, we reject Williams's claim that the court abused its discretion in reopening the case.

### G. *The District Court's Entrapment Defense Instruction*

Leslie argues that Judge Duffy did not instruct the jury that, with regard to an entrapment defense, a government informant's actions could be attributed to the government. The record does not support Leslie.

> Judge Duffy instructed the jury as follows: I talked to you about the question of entrapment and how the government agent may entrap somebody and how that is a defense. Please recognize that the government agent includes an informer who was working for the government at the time that he is there. That's something you should recognize.

Leslie's claim has no merit.

### CONCLUSION

Accordingly, we reverse Leslie's conviction for money laundering as to the $20,000 transaction, but affirm the district court in all other respects. We remand the case to the district court with instructions to dismiss the indictment as to the $20,000 test transaction.