**UNITED STATES of America,**

v.

**Krishendat BALJIT, Defendant.**

**No. 01 CR. 389(VM).**

United States District Court,
S.D. New York.

May 8, 2002.

David Berardinelli, United States Attorney Criminal Division, New York City, for U.S.

### DECISION AND ORDER

MARRERO, District Judge.

In a two-count indictment filed on April 20, 2001, Defendant Krishendat Baljit (hereinafter "Baljit") was charged with: (1) conspiracy to commit postage meter fraud, in violation of 18 U.S.C. § 371, and (2) engaging in or aiding and abetting postage meter fraud, in violation of 18 U.S.C. §§ 501 and 2. At the conclusion of a four day jury trial on March 18, 2002, Baljit was acquitted on Count One and convicted on Count Two. At the close of the Government's case on March 14, 2002, Baljit moved for a judgment of acquittal on both counts, pursuant to Federal Rule of Criminal Procedure 29 (hereinafter "Rule 29"). The Court reserved judgment and Baljit renewed his motion on March 18, 2002, after the jury returned a verdict of guilty on Count Two.

On April 8, 2002, Baljit filed a memorandum of law in further support of his motion for a judgment of acquittal (hereinafter "Def.'s Mot."). On April 12, 2002, the Government filed a letter brief in opposition to Baljit's motion (hereinafter "Govt.'s Opp.") and on April 17, 2002, Baljit filed a reply letter brief (hereinafter "Def.'s Reply"). In a letter dated April 15, 2002, Baljit requested the Court to consider, in the alternative, granting him a new trial, pursuant to Federal Rule of Criminal Procedure 33 (hereinafter "Rule 33"). In making this motion, Baljit rested on the arguments presented in the memorandum of law in support of his earlier motion for a judgment of acquittal. For the reasons set forth below, Baljit's motions are denied.

### I. FACTUAL BACKGROUND

The following facts were adduced during the course of trial. During the period relevant to the Indictment, American Presort Inc. (hereinafter "API") possessed a number of postage meters owned by the United States Postal Service (hereinafter the "Postal Service"), pursuant to license agreements that API had entered into with the Postal Service.[1] From February 1997 through June 1997, two of the postage meters malfunctioned so that they printed incorrect postage on the mail processed at API. The Government charged that Baljit and others used the malfunctioning postage meters to print free postage, knowing that the Postal Service would not be paid for such postage, thereby defrauding the Postal Service out of several million dollars.

---

1. Such license agreements required that API return any postage meters that malfunctioned to the Postal Service and prohibited anyone from tampering with the proper functioning of the meters. (See Trial Tr. at 122–23, 306–08 and Govt. Ex. 1A) In addition, the Postal Service fixed a conspicuous label on every postage meter that stated: "Warning. Meter tampering is federal offense, reward of up to $50,000. The U.S. Postal Service offers a reward of up to $50,000 for information leading to the conviction of any person who misuses postage meters in any manner resulting in the Postage Service not receiving correct postage payments." (See Trial Tr. at 308 and Govt. Exs. 1, 2, and 3.)

At trial, it was uncontroverted that certain individuals at API, other than Baljit, had participated in a conspiracy to defraud the Postal service and API's customers. For example, the Court admitted, with a limiting instruction, the guilty plea allocution of Steven Fruchter (hereinafter "Fruchter"), who had been the President of API during the relevant time period. In his allocution, Fruchter admitted to participating in a pattern of criminal activity that included fraud through the alteration of reports and accounting statements to the Postal Service and API's customers and through knowingly allowing malfunctioning postage meters to print free postage. (Trial Tr. at 283–84.) Similarly, the controller of API, Leonard Taylor (hereinafter "Taylor"), acknowledged at trial that he had pled guilty to participating in a racketeering enterprise through a number of acts, including defrauding the Postal Service by allowing malfunctioning postage meters to print free postage. (Trial Tr. 132–33.)

During this period, Baljit was the nighttime supervisor of the postage meter room at API and his brother, Deodat Baljit (hereinafter "Deodat"), was the daytime supervisor. Baljit supervised a number of postage meters and employees who operated them from 7 p.m. to 7 a.m. He was also responsible for creating and maintaining postage meter logs that were used to bill customers who had their mail metered by API. Such logs recorded the remaining balance on each postage meter so that Baljit knew when a meter had to be returned to the Postal Service to be refilled. (Trial Tr. at 113–115.) Baljit also determined which mail would be run through particular postage meters and he had the authority to suspend and fire employees

who worked under him in the meter room. (Trial Tr. at 367.)

At some point in 1994, one of the postage meters, called a Hasler 5 meter based on its model number and the company that manufactured it (hereinafter the "H–5 meter"), started printing a free dollar on every piece of mail that it metered. After consulting with Fruchter, Taylor instructed Baljit and Deodat to maintain separate postage logs for the H5 meter to record each time the meter printed extra postage. (Trial Tr. at 131–33.) Fruchter and Taylor then used these logs to bill customers for the extra postage, which over the course of about one and one half years totaled approximately $350,000.

At trial, one of the employees in the meter room, Hector Gonzales (hereinafter "Gonzales"), testified that when he became aware that the H5 meter was malfunctioning, he told Baljit that it was printing a dollar of free postage on each piece of mail. When asked about Baljit's response, Gonzales testified: "He acted as if I hadn't said anything. He just ignored me and didn't say anything." (Trial Tr. 371.) After receiving no response from Baljit, Gonzales told Frank Singh, the general manager at API, that he did not want to use the malfunctioning meter because he felt it was illegal to do so. Singh told Gonzales that he had to use the meter and that he would be fired if he refused. (Trial Tr. at 371–72.) Baljit continued to use the H5 meter during the night shift, and on approximately ten occasions, he instructed Gonzales to continue using the same meter during the day. (Trial Tr. at 372–73.)

At some point during the night shift on January 30, 1997, another postage meter, called a Hasler 6 meter (hereinafter the "H–6 meter"), began malfunctioning when the balance left on the meter rolled over.[2]

2. Under normal circumstances, when a postage meter is obtained from the Postal Service,

a licensee makes a payment and that amount is entered as the starting balance on the me-

Baljit, who was supervising the use of the meter at the time, informed Taylor of the incident when Taylor arrived for work the next morning. According to Taylor, "Baljit's demeanor appeared to be excited" when he told him about the malfunctioning meter. (Trial Tr. at 149.) After consulting with Fruchter, Taylor instructed both Baljit and Deodat to continue using the H6 meter and to keep separate logs for the mail that was stamped with the H6 meter. As with the H5 meter, Taylor instructed them to keep these separate logs so that API could bill its customers for the extra postage that it was obtaining from the malfunctioning meter. (Trial Tr. at 150–53.) After the H6 meter rolled over, every Friday Taylor asked that the meter be brought into his office for storage over the weekend. (Trial Tr. at 153.) Other postage meters were left out in the meter room.

At some point thereafter, Baljit told Gonzales that the H6 meter had rolled over. According to Gonzales, Baljit was smiling at the time. (Trial Tr. at 382.) Gonzales told Baljit that he did not want to use the meter because he felt that it was illegal. (Trial Tr. at 383.) Baljit did not tell Gonzales that the free postage was being paid for. (*Id.*) Gonzales also noticed that the malfunctioning H6 meter was not placed on its proper base. Instead, it was placed on the base for a bigger machine, which allowed the H6 meter to stamp mail faster than normal. (Trial Tr. at 384–85.) Gonzales testified that he saw on one occasion Deodat hitting the bottom of the H6 meter with a hammer and a screwdriver. The next day, Gonzales saw Deodat and Baljit talking and pointing at the print mechanism of the H6 meter. (Trial Tr. at 388.)

On June 27, 1997, United States postal inspectors entered the premises of API with a search warrant. They seized the H5 meter, which they found under Taylor's desk, and the H6 meter, which they found buried in a bin of mail. They also found a number of postage meter logs, including the separate log that had been maintained for the H6 meter. At trial, Postal Inspector Joseph McGinley testified that his analysis of API's general postage logs and the daily logs revealed that after the H6 meter rolled over, the amount of mail that API processed with the H6 meter per week increased dramatically from approximately 76,000 to approximately 600,000 pieces. (Trial Tr. at 477–78.)

## II. DISCUSSION

Because Baljit moves for a judgment of acquittal and in the alternative, for a new trial, the Court must consider the legal standard applicable for each motion.

## A. STANDARDS OF REVIEW

### 1. *Rule 29*

Under Federal Rule of Criminal Procedure 29, a Court "shall order the entry of judgment of acquittal . . . if the evidence is insufficient to sustain a conviction of [any charged] offense or offenses." F.R.Crim. P. 29(a). In considering such a motion, the Court must decide, based on all of the relevant evidence, whether a rational juror "might fairly conclude guilt beyond a reasonable doubt." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984) (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir.1972)); *accord United States v. Bloome*, 784 F.Supp. 23, 25 (E.D.N.Y. 1992). A Court must draw all reasonable inferences in favor of the Government, *see*

---

ter. When a properly functioning meter approaches zero, it automatically locks. The licensee must then return to the Postal Ser-

vice and make a payment. The Postal Service then unlocks the meter and resets the balance to the amount of the new payment.

*Mariani,* 725 F.2d at 865, and all issues of credibility in favor of the jury's verdict. *See United States v. Weiss,* 930 F.2d 185, 191 (2d Cir.1991); *United States v. Roldan–Zapata,* 916 F.2d 795, 802 (2d Cir. 1990).

A defendant challenging the sufficiency of evidence under Rule 29 must establish that, "viewing the evidence in the light most favorable to the government, ... no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Leslie,* 103 F.3d 1093, 1100 (2d Cir.), *cert. denied,* 520 U.S. 1220, 117 S.Ct. 1713, 137 L.Ed.2d 837 (1997) (quoting *United States v. Taylor,* 92 F.3d 1313, 1333 (2d Cir.1996)).

### 2. *Rule 33*

■ Under Federal Rule of Criminal Procedure 33, a motion for a new trial may be granted "if the interests of justice so require." Fed.R.Crim.P. 33. By its terms, Rule 33 "gives the trial court 'broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" *United States v. Ferguson,* 246 F.3d 129, 133 (2d Cir.2001) (quoting *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992)). A defendant who makes such a motion has the burden of proving the necessity for a new trial. *See United States v. Ferguson,* 49 F.Supp.2d 321, 323 (S.D.N.Y.1999) (citing *United States v. Soblen,* 203 F.Supp. 542 (S.D.N.Y.1961)). In considering a Rule 33 motion, a district court must strike a balance between weighing the evidence and credibility of witnesses and not "wholly usurping" the role of the jury. *United States v. Autuori,* 212 F.3d 105, 120 (2d Cir.2000).

Because a court generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, "[i]t

is only where exceptional circumstances can be demonstrated" that a trial judge may intrude upon a jury's factual determinations. *Sanchez,* 969 F.2d at 1414. One example of an exceptional circumstance is when testimony is "patently incredible or defies physical realities," although a district court's rejection of trial testimony by itself does not automatically warrant a new trial under Rule 33. *Ferguson,* 246 F.3d at 134.

■ Generally, a trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29. For example, unlike the standard governing a Rule 29 motion, under Rule 33 the Court is not required to view the evidence in the light most favorable to the Government. *See Ferguson,* 49 F.Supp.2d at 323 (citing *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir. 1980)). A trial court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict. *Ferguson,* 246 F.3d at 134. Nonetheless, a trial court must exercise its Rule 33 authority "sparingly" and in "the most extraordinary circumstances." *Sanchez,* 969 F.2d at 1414. The ultimate test on a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." *Ferguson,* 246 F.3d at 134 (citing *Sanchez,* 969 F.2d at 1414). Before a Court grants a motion for a new trial under Rule 33, "[t]here must be a real concern that an innocent person may have been convicted." *Id.*

### B. *ANALYSIS*

■ Considering Baljit's Rule 29 motion, the Court concludes that he has not established that "no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *Leslie,* 103 F.3d at 1100. Count Two of the Indictment charged that Baljit

engaged in or aided and abetted postage meter fraud, in violation of 18 U.S.C. §§ 501 and 2. Based on the language of the statute, the Court instructed the jury that it was required to determine that the Government had proven the following four elements beyond a reasonable doubt to find Baljit guilty of Count Two: first, that he made or printed, or authorized to be made or printed a postage meter stamp; second, that the postage meter stamp being made or printed was of the kind authorized and provided by the Postal Service; third, that he did not have the special authority or direction from the Postal Service to make or print the postage meter stamps in the manner that he did; and fourth, that he acted knowingly, willfully, and intentionally. *See* 18 U.S.C. § 501.[3] In the alternative, the Court instructed the jury that it could find Baljit guilty of Count Two if it found beyond a reasonable doubt that another person had engaged in postage meter fraud and that Baljit willfully and knowingly associated himself in some way with the crime, and he willfully and knowingly sought by some act to help make the crime succeed. *See* 18 U.S.C. § 2.

In his motion papers, Baljit does not dispute that the H5 and H6 meters malfunctioned and incorrectly recorded the amount of postage that was being used. Rather, his main contention is that the Government presented insufficient evidence on the fourth element, that he was using postage without the authority of the Postal Service knowingly, willfully, and intentionally. Specifically, Baljit maintains that he had "neither the responsibility nor the ability to pay for the postage" printed by the malfunctioning meters and that he

could not be convicted unless there was "evidence proving that he knew that his employers intended not to pay for the postage he had been directed to print." (Def.'s Mot. at 3–4.) At most, Baljit asserts, the evidence established that he knew that API had not paid for postage at the time he used the H6 meter and he knew that API was "obtaining some benefit from this arrangement." (Def. Mot. at 11.) The Court disagrees.

During the trial, the jury heard and saw a considerable amount of circumstantial evidence that could have reasonably supported an inference that Baljit knew that the free postage would not be paid for and that the use of the malfunctioning meters was illegal. For example, Gonzales testified that Baljit ignored him when he told Baljit that using the H5 meter was illegal. The H5 meter had a conspicuous warning label on its side, stating that any person who misused a postage meter in any manner resulting in the Postage Service not receiving correct postage payments was committing a federal offense. The jury could have reasonably inferred that if Gonzales, who had less experience than Baljit and was his subordinate, knew that using the H5 meter was illegal and so protested to Baljit, then Baljit knew the same. Furthermore, Baljit's silence after Gonzales' statement suggests that Baljit did not disagree. It would be reasonable to expect that Baljit would tell Gonzales why the use of the H5 meter was not illegal as Gonzales' supervisor, especially in light of the fact that Baljit instructed Gonzales to use the H5 meter on future occasions.

Moreover, the testimony of two witnesses suggested that Baljit was pleased

---

**3.** The relevant part of 18 U.S.C. § 501 states: "Whoever makes or prints, or authorizes to be made or printed, any postage stamp, postage meter stamp, stamped envelope, or postal card, of the kind authorized and provided by the Post Office Department or by the Postal Service, without the special authority and direction of the Department or Postal Service ... [s]hall be fined under this title or imprisoned not more than five years, or both."

when the H6 meter began malfunctioning. Taylor testified that Baljit appeared excited when Baljit told him that the H6 meter had rolled over and Gonzales testified that Baljit was smiling when he told him about the rollover. Gonzales also observed Baljit and Deodat examining an area of the H6 meter that he saw Deodat hitting with a hammer and screwdriver the day before. Although Gonzales did not hear the contents of the conversation, the jury reasonably could have inferred that Baljit and Deodat were discussing Deodat's attempt to tamper with the meter the day before. In addition, Gonzalez testified that the H6 meter was treated in a special manner, suggesting that it was particularly valuable to API because it was printing free postage. The H6 meter was mounted on the base for a larger machine so that it could print postage faster then other meters of the same size. Unlike other meters, the H6 meter was stored in Taylor's office when it was not being used. These facts, combined with others, could have reasonably supported an inference that Baljit knew that the H6 meter was earning illicit profits for API.

In his morning papers, Baljit concedes that API received a 'special benefit' from the H6 meter, as evidenced by its unusual use and treatment. However, he contests the Government's assertion that the only "special benefit" that could have existed was free postage. (*See* Def.'s Reply at 2.) Baljit states that from his perspective "it was *just as possible* that American Pre–Sort simply intended to take advantage of the broken meter by deferring payment to the post office until it had been paid by its customers . . . ." (*Id.* (emphasis added).) The fatal point in Baljit's argument is that although such an explanation may have been "just as possible," the Court is required to draw all reasonable inferences in favor of the Government. Implicit in Baljit's statement is an assumption that it was equally possible that Baljit knew that the H6 meter was being used illegally to print free postage, and hence that the jury reasonably could have so inferred. After reviewing the evidence presented at trial, drawing all reasonable inferences in favor of the Government and all issues of credibility in favor of the jury's verdict, the Court concludes that there was sufficient evidence for the jury to find Baljit guilty of the postage meter fraud alleged in Count Two. *See Mariani,* 725 F.2d at 865, *Weiss,* 930 F.2d at 191.

■ Considering Baljit's motion, in the alternative, for a new trial pursuant to Rule 33, the Court notes that Baljit's burden is different, in that, rather than the challenging the sufficiency of the Government's evidence, he must establish that "letting [his] guilty verdict stand would be a manifest injustice." *Ferguson,* 246 F.3d at 134. In spite of this difference, the Court concludes that a new trial is unwarranted. In considering a Rule 33 motion, a Court must generally defer to the jury's assessment of the evidence presented at trial. *Sanchez,* 969 F.2d at 1414. Baljit has presented neither new evidence nor any exceptional circumstances that would compel this Court to do otherwise. As discussed above, during the course of the trial, there was significant evidence that Baljit knowingly engaged in postage meter fraud. Although Baljit has proposed an alternative explanation for why he used the malfunctioning H6 meter in a special manner, this argument was made to the jury and rejected when it returned a conviction on Count Two. There is simply no evidence to suggest that Baljit's conviction may have been a miscarriage of justice, requiring this Court to hold a new trial. Although Baljit may take issue with the necessity of prosecuting someone in his position, having gained little or no financial benefit from the fraud for which he was

indicted, it is not the within the province of this Court to question this aspect of the law or prosecutorial discretion regarding its enforcement.

## III. CONCLUSION AND ORDER

For the reasons set forth above, it is hereby

**ORDERED** that Baljit's motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 is DENIED; and it is further

**ORDERED** that Baljit's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 is DENIED; and it is finally

**ORDERED** that Baljit appear for sentencing, as previously scheduled, on May 17, 2002, at 2 p.m.

**SO ORDERED.**